JAMES W. ATWILL *vs.* CHARLES G. MACKINTOSH.

Norfolk. Jan. 26. — March 31, 1876. ENDICOTT & DEVENS, JJ., absent.

A written communication is libellous which tends to expose a person to reproach and disgrace.

In an action for libel it appeared that the defendant was employed by the father of the plaintiff's wife to accompany her home on a visit to her parents, and that the defendant was directed to make inquiries concerning the general standing of the plaintiff. On the return of the defendant, he reported the result of his inquiries to the father, and wrote the letter, alleged to contain the libel, and to the same effect, to the mother of the plaintiff's wife. *Held,* that the trust which the defendant had assumed, and the relation in which he stood to the parents of the plaintiff's wife, created an occasion which made the communication privileged, if fairly made. *Held, also,* that it was for the jury to decide, on the question of express malice, whether the defendant had made an honest report justified by the relations in which he was placed, or whether it was made with a purpose wrongfully to defame the plaintiff.

TORT for libel. The declaration was as follows: "And the plaintiff says that the defendant falsely and maliciously slandered the plaintiff by writing to one Annette Richards, of West Roxbury, in the county of Norfolk, a letter of which the following is a true copy: ‘West Roxbury, Feb. 14, 1871. My friend Mrs. Richards: When I came to your home on last Christmas morning, bringing as I did your Carrie, sick and helpless as she was, I could not but help feeling thankful that you had her safely once more in your happy home, truly made happy

by having your child returned to you, after these few months of unparalleled experience of depravity, so safe. You can never know the terrible ordeal that your sister and I passed through in accomplishing this object; words of mine can never express the day's experience in the city of St. Louis. The night I spent there was not one of sleep; there was a feeling constantly brooding over me that something connected with our errand was wrong; still I tried not to look or to act as I felt, for fear some one might construe my being there into a disposition to criticise; still when I got up in the morning to prepare for the day's work, before hearing a word of censure from any one, I was impressed with the thought that we had a trying day before us, and that we were to bear away a poor heart-broken child far away to her own native home, where she could, if spared to live, be among her own true friends once more; and such a day I hope will never come to us again, for we could not help feeling and saying that if we could only get your child to you again, whether dead or alive, it mattered but little to us — for in either case we felt sure she would be safe — we were prepared for the worst.

" ' It seemed best, for a few days, that as few people should know of this wretched case of depravity and deception as possible, until Carrie should be able to have the terrible news broken to her. As soon as I learned that Carrie had had them told her, or some of them, and of course you knew of it at the same time, I took the first opportunity to call upon you and Carrie, so that we might share in common this terrible affliction that seemed to come upon us all and to your household, in a degree that made me feel very anxious as to the result; but I felt glad when you seemed to feel so thankful that you had your Carrie once more, and to hear you express the determination that she should never leave you again. Since then I have never been able to see you, although I have called at your house quite a number of times. I have kept pretty quiet amid the gust of stories, that have been flying about wherever I go, in relation to this shocking affair, and all sorts of questions are asked me, and as I try to evade, they generally wind up by asking me, are they as bad as they are reported to be? Of course I cannot, after being upon the ground, seeing and hearing what I did, feel like at

tempting to contradict even the worst one that I have ever heard; so time has worn on until a few days ago, about the time your last sewing society was held, I heard that a near neighbor of mine was advising Carrie's returning to this bad man, (meaning the plaintiff,) as it seems to me, and further it comes out that a near neighbor of yours told this same woman that it was all settled that Carrie was going back.

"'Can you imagine my feelings when I heard of this? You may depend that it struck me as strangely as it would had I heard that black could be made white; that a thief, a liar, a drunkard, a libertine, a seducer, a man black with crime, a ravisher of homes, could be pure and virtuous. Yes, my friend, when I think of one poor young woman, carted through the streets of St. Louis, bereft of reason, homeless, houseless, forsaken, ruined, how can I, how can you ever think of the perpetrator of such a deed, (meaning the plaintiff,) without exclaiming "*fiend, brute,*" (meaning the plaintiff.) . Can it be that these women are concocting some plan to snatch away again your only daughter, your only child, and thrust her again into the gulf of ruin, that she has now been so safely rescued from? (Meaning that said only daughter, who is the plaintiff's wife, would be ruined if she went back to live with her husband, the plaintiff, and that the plaintiff is a fiend, a brute, a thief, a liar, a drunkard, a libertine, a seducer, a man black with crime, and a ravisher of homes.) It cannot be. It must be, I feel, that you will never allow one of them to bring their influence to bear upon her for such a purpose. Your friend, Charles G. Mackintosh.

"'Mrs. R. · I think it will be well not to let Carrie, or Mrs. Rollins, or Aunt Hannah, see or know about this letter, for I have only written it for you, so that when people are trying to induce Carrie to leave you and her true and long tried friends, you will, as her mother, be able to frustrate all their plans. I hope and trust that all things will come and do for you and yours, so that you may be able to feel that this dark cloud may be wholly lifted from you. Chas. G. M.'

"And the plaintiff says that the defendant, in writing the letter above set forth, intended to accuse and did accuse the plaintiff of the crime of larceny, and of being a thief, a liar, a drunk-

ard, a libertine, a seducer, a man black with crime, a ravisher of homes, a fiend and a brute, and also of being a man who would ruin his wife if she should live with him, she then being temporarily away from her husband, the plaintiff, with his full and free consent."

The answer admitted that the defendant wrote and sent the letter, but averred that it was written in good faith, with an honest belief in its truth, and under such circumstances that it was a privileged communication.

Trial in this court, before *Ames*, J., who reported the case for the consideration of the full court in substance as follows:

No attempt was made to prove express malice, and it was conceded that there was no evidence of express malice, except so far as the same is to be inferred from the letter itself. It appeared that the plaintiff and his wife resided in St. Louis, Missouri; that his wife became sick, and was advised by her physicians to visit her parents in West Roxbury; and that the plaintiff wrote to her father, requesting him to send for her. Upon the receipt of this letter, the father employed the defendant to go to St. Louis, to accompany her on the journey home. He accordingly went there, arriving at St. Louis on a Wednesday morning, and left the next day in the afternoon on his return, bringing with him the plaintiff's wife, who was then in a very feeble condition of health. After her arrival in this state, she gradually recovered; and, after the restoration of her health, the family were divided upon the question of her return to her husband; she and her mother wishing that she should return, and her father being greatly opposed to her so doing.

It also appeared that when the father received the plaintiff's letter informing him of the sickness, he said to the defendant: "There is something in that letter that I do not like. He says that at this juncture he cannot accompany her. I wish you to make inquiries at St. Louis about his standing, and as to his connection in business with Studley, and also as to his general standing." The defendant undertook to execute this commission. Upon his examination as a witness, he was permitted, against the plaintiff's objection, to tell what inquiries he made, and what information he received in relation to the plaintiff's general character for integrity and moral worth. He accordingly testified as

to the information received from Studley, denying that the plaintiff was his partner, denouncing him as extravagant in his habits, dishonest, guilty of great immorality, cruelty and villany towards a young woman whom he had seduced, and of causing an operation for an abortion to be performed upon her. He also testified as to information received from the physician who attended upon Mrs. Atwill, who, among other things, gave him a copy of the St. Louis Times, containing a particular account of the transactions with the young woman, and referring to the plaintiff by name as the guilty party, which account the physician, a Dr. Franklin, declared to be true. The foregoing extract from the newspaper was admitted and allowed to be read, against the plaintiff's objection, and the witness was allowed, also under objection, to testify that he obtained information of the like general character from another person at St. Louis.

It also appeared that, on his arrival at West Roxbury, the defendant reported all he heard to Edward Richards, the father of the plaintiff's wife, and placed a copy of the newspaper in his hands. Richards testified that he told his wife what he had heard from the defendant, in part, and that she did not appear to believe all was true that he told her. There was evidence tending to show that she avoided the defendant, and took pains not to have any conversation with him on the subject. The defendant was requested by Richards to give her the information, and he testified that he made several unsuccessful attempts to do so orally, and for that reason he saw fit to write the letter which is complained of in this action. Since the letter was written, the daughter has returned to the plaintiff, her husband, with the concurrence of her mother, but against the will and contrary to the advice of her father.

It was admitted by the defendant that the disreputable acts charged upon the plaintiff by the parties in St. Louis were charged to have been committed before the plaintiff's marriage with his present wife, the plaintiff having been married in September, and the defendant's visit to St. Louis being in December, 1870.

The defendant, upon these facts, contended that, no express malice being charged, the communication was made in pursuance of a trust and duty to a party interested and having a right to

be informed, and also a duty to act; and that it was made in good faith and with a belief that it was true. He also contended that the language of the letter was not libellous, and that no ac-tion was maintainable thereon.

The judge directed a verdict for the defendant, which was to be set aside and the case to stand for trial, if upon the report the plaintiff could maintain the action; otherwise, judgment on the verdict.

*G. A. Somerby & F. F. Heard*, for the plaintiff.

*J. R. Bullard*, for the defendant.

AMES, J. The letter, as appears from the answer and from the argument of the defendant, was written as the result of his inquiries at St. Louis in relation to the plaintiff's character, and for the apparent purpose of dissuading his mother in law from consenting to his wife's returning to live with him. In deciding whether the communication so made was libellous and therefore actionable in its character, supposing it to be false and not to be justified by the occasion, the entire letter and the circumstances under which it was written are to be taken into consideration. It might be libellous, even though no criminal offence were dis-tinctly charged against the plaintiff. We cannot doubt that it conveys and was intended to convey the idea that the plaintiff was a depraved and unprincipled man; that he was a "bad man," and that his character was so bad that it would be dan-gerous and ruinous to his wife to again attempt to live with him. Under the rule applicable to written slander, the letter was libel-lous for the reason that it tended to expose the plaintiff to re-proach and disgrace. 1 Saund. 248, note to *Craft* v. *Boite.* *Mil-ler* v. *Butler*, 6 Cush. 71.

There can be no doubt that the trust which the defendant had assumed, and the relation in which he stood to the parents of the plaintiff's wife, created an occasion which would have furnished the excuse of "privilege" to any communication fairly made to them upon his return from his mission. "If fairly warranted by any reasonable occasion or exigency, and honestly made, such communications are protected for the common convenience and welfare of society, and the law has not restricted the right to make them within any narrow limits." Baron Parke, in *Too-good* v. *Spyring*, 4 Tyrw. 582. This privilege is not defeated

by the mere fact that the communication is made in terms that were intemperate or excessive from over excitement. *Brow* v. *Hathaway*, 13 Allen, 239. *Harrison* v. *Bush*, 5 E. & B. 344. *Joannes* v. *Bennett*, 5 Allen, 169, 170.

It may happen, however, that an occasion which would justify such a communication may be abused in such a manner as to deprive the party making it of the excuse of privilege. Upon this question, the plaintiff would have a right to go to the jury, for the reason that a decision by the court that the occasion was privileged proceeds upon the assumption that the communication was honestly made, in the belief that it was true, and with no motive of malice, — an assumption which the plaintiff has the right to show to be untrue, if he can. The jury may draw the inference of malice, not only from extrinsic facts, — as, for instance, from proof that the defendant knew the charges to be false, or had no reason to believe them to be true, — but also from the terms in which the communication is made. If those terms are in manifest excess of the occasion; *Fryer* v. *Kinnersley*, 15 C. B. (N. S.) 422 ; if they contain strictures on motives and conduct not warranted by the facts; *Cooke* v. *Wildes*, 5 E. & B. 328 ; or if they go beyond what is reasonable in imputing crime : all these circumstances would tend to show malice. It was therefore a mistake to withdraw the case from the jury. It should have been submitted to them to decide whether it was an honest report, made in good faith, justified by the information which the defendant had obtained, and with a reasonable purpose of protecting the rights and interests of the party in whose behalf he had acted ; or whether, on the other hand, it was made with a purpose wrongfully to defame the plaintiff.

*Verdict set aside.*