WILLIAM J. BYAM, Appellant, *v.* JENNIE E. COLLINS et al.,
Respondents.

In an action for libel and slander it appeared that plaintiff was on terms of social intimacy with D. and was paying her attention with a view to matrimony.   Defendant J., in April, 1879, wrote to D. a letter containing charges against plaintiff, which was the libelous publication complained of.   Up to the January before the writing of the letter J. and D. had been very intimate friends; then they became somewhat estranged and their intimacy ceased.   During the intimacy, and about four years before the writing of the letter, D. repeatedly requested J. "if she knew anything about any young man she went with, or in fact any young man in the place, to tell her."   D. was not then contemplating marriage with any young man, and did not know the plaintiff.   The letter referred to the former friendship, to the estrangement, and stated substantially that D. was still very dear to the writer, and for this reason she felt that she must interfere.   J., as a witness, testified that when she wrote the letter she thought as much of D. as if she belonged to her family; that she had heard the defamatory rumors and believing them, did not wish her to marry the plaintiff.   *Held* (DANFORTH, J., dissenting), that while J. could properly tell what she knew about young men, she was not justified in defaming them even upon request by telling what she did not know and what was not true, although her defamatory statements were based upon rumors and hearsay which she believed to be true; and that, therefore, the letter was not a privileged communication; also, that the evidence failed to show that the letter was written in pursuance of a request made so long before; on the contrary, it appeared from the circumstances and from the letter itself that D. did not at the time desire any information from J., and that this was known to the latter.

*It seems* that if J. had been asked by D. for information as to plaintiff's character and standing, she could properly have given any information she possessed, provided she acted in good faith and without malice.

As privileged communications are exceptions to the general rule which implies malice in a libelous publication and infers some damage, it rests with the party claiming the privilege to show that the case is brought within the exception.

The exception covers cases where a communication is made *bona fide* upon any subject-matter in which the party making it has an interest, or in reference to which he has a duty, legal, moral or social, which may fairly be presumed to have led to the communication, when made to a person having a corresponding interest or duty.

The claim of a moral duty will not be sustained when a person as a volunteer has made defamatory statements against another in a matter in which he has no legal duty or personal interest, unless he can find a justification in some pressing emergency.

As to whether a libelous publication is privileged is a matter of law (DAN-FORTH, J., dissenting), and *it seems* that when, upon the trial of an action for libel, it has been held as matter of law that the publication was privileged, the burden rests upon the plaintiff to establish that it was maliciously made, this is a question of fact to be determined by the jury. *Todd* v. *Hawkins* (8 C. & P. 88) distinguished.

When not privileged the law implies malice in the case of oral as well as written defamation.

As to the slanderous words charged, J. testified that she uttered them to one C. in confidence, after the most urgent solicitations on his part that she should tell what she knew about plaintiff. The court charged that the words so uttered were privileged. *Held,* error.

*It seems* that even had it appeared that C. had the interview with J. at the solicitation of plaintiff and as his friend, this would not make the slanderous words uttered in the interview privileged.

Defamatory words are not privileged simply because uttered in the strictest confidence by one friend to another, nor because uttered upon the most urgent solictations.

*Byam* v. *Collins* (39 Hun, 204) reversed.

(Argued June 22, 1888; decided November 27, 1888.)

APPEAL from judgment of the General Term of the Supreme Court in the fifth judicial department, entered upon an order made the first Tuesday of January, 1886, which affirmed a judgment in favor of defendants entered upon a verdict and denied a motion for a new trial. (Reported below, 39 Hun, 204.)

This was an action for libel and slander.

The defendants are husband and wife. Mr. Collins is sued by reason of that relationship only. The charge of libel is based upon a letter written by Mrs. Collins to one Dora McNaughton in these words :

"CALEDONIA, *April* 11, 1879.

"MY DEAR DORA :

"For a long time I have been earnestly solicited by your friends and mine to warn you in some way of the danger you are in, in the company you keep at present. I have refrained from doing so for various reasons, the principal one being the fact that I was very rudely treated by you one day at Mrs. Grant's when I was there for the purpose of doing you

a favor which you have never acknowledged to this day, although you have availed yourself of my friend's kindness.

"You have, also, given up coming to my house, for what reason I do not know, for I have never injured you or yours in thought, word or deed.

"But to return to the subject. Since the exhibition of last Wednesday I have decided to hold my peace no longer, feeling that if I do and your life is wrecked (as it is sure to be if you marry or have further acquaintance with that man) that I shall in some way be responsible for it, inasmuch as I neglect to do my duty. And, oh, Dora! be warned by me before it is too late, have nothing to do with him for the sake of the friendship we once had and which was very dear to me. Oh! Dora, I have loved you as a sister and I cannot see you degraded and your name becoming a by-word in the mouth of every rowdy in town. Can you thus lightly set aside a tried and true friend of years for the sake of an adventurer of a few weeks acquaintance? I have thought that ere this your usual good sense would come to your rescue, but the mystery seems to grow deeper and deeper.

"There are persons in this town who, at present, profess great friendship for you who, I feel certain, are leading you on only that they may glory over your humiliation, which must come sooner or later, for you cannot handle fire and not be burned, and it is to save you from that I make this appeal to you. I have every reason for believing that both my husband and myself have been lied about and misrepresented to you, but have you been honest in listening to a stranger and taking his word and believing it without further proof?

"Is it possible that you know the character of that man? I know that if you did you would spurn him from your house and presence forever, and if you will but give me the opportunity of a personal interview with yourself, I will tell you a few truths, and, as no one need fear the truth, that will open your eyes and, perhaps, save you from a life-long sorrow and regret.

"Do not deny me this favor for you are still very dear to me, and I feel that I must interfere in your behalf as no one else has dared to do it. I close with my love to you, hoping that our Heavenly Father may keep you from all harm, and show you the right way out of these difficulties.

"I remain, as ever, your true friend,

"JENNIE E. COLLINS."

The answer admits the writing and publication by sending the letter to Dora ; denies that it was prompted by malice or ill feeling ; declares that the writing was founded upon information, which she believed, and claims that the communication was privileged by reason of her friendly relations with Dora.

The charges of slander are, so far as material, contained in the second count of the complaint, and are as follows :

"The said plaintiff further says, upon information and belief, that on or about the 15th day of April, 1879, at Caledonia aforesaid, the said defendant, Jane E. Collins, in the presence and hearing of Dugald E. Cameron, of Caledonia aforesaid, and of divers other good and reputable citizens of the state of New York, wrongfully, maliciously and with intent to cause it to be believed that the said plaintiff was a person unfit and unworthy to be associated with, and was unfit and unworthy to be consulted professionally as an attorney and counselor or to be trusted in his profession and business, then and there spoke of and concerning the said plaintiff and of and concerning his said profession and business, the false and defamatory words following, to wit : 'He' (the said plaintiff meaning), 'is a bad man and ought to be driven out of the place and is not fit to associate with decent people.' 'He' (the said plaintiff meaning), 'insulted a young lady in Geneseo by going into her room, and she drew a revolver on him and he had to get down on his knees and beg of her to let him off.' 'He' (the said plaintiff meaning), 'also went to Canada in company with a woman in private.' 'He' (the said plaintiff meaning), 'is also guilty of dishonest practices as a lawyer and is not to be trusted.' 'He' (the said plaintiff meaning), 'is

altogether void of principle both as a man and in his business.'
Whereby and by reason of all which false and defamatory
words in the premises in the second cause of action set forth
a number of persons and, in particular, Robert Espie, Willis
Remington, Robert J. Menzie and Daniel McNaughton, who
had theretofore been accustomed to deal with and employ the
plaintiff in his business aforesaid, ceased to deal with him,.
and the plaintiff was thereby deprived of their custom and
patronage and of the profits he would otherwise have realized
by such custom and patronage, and was otherwise greatly dam-
aged and injured in his professional business and reputation."

The answer to the said count is as follows:

" And for answer to the alleged cause of action as stated in
the second count or cause of action in the said plaintiff's com-
plaint contained, the said defendant, Jennie E. Collins, says
that on or about the time stated in said count the said Dugald
E. Cameron, an influential and leading citizen of Caledonia,
sought and procured an interview with the said defendant for
the purpose as he stated, of amicably arranging the difficulty
between the said defendant and said plaintiff; that the said
Cameron requested the said defendant to state what she knew
or had heard about the said plaintiff; that said Cameron stated
that he was the friend of said defendant and wanted her to
talk to him as her friend; that, in reply to inquiries by said
Cameron, the said defendant stated to him what she had heard
of and concerning said plaintiff; that she expressly said, that
she knew nothing about the said plaintiff, except from hearsay,
and she stated to said Cameron, in substance and effect, that
she had heard that he insulted a lady in Geneseo, by going
into her room, and that she drew a revolver on him, said plaint-
iff, and he had to get down on his knees and beg of her to
let him off; that the said defendant also said that she heard
that the said plaintiff went to Canada in company with a
woman privately; and she further stated, in substance and
effect, that she had been told that said plaintiff was guilty of
dishonest practices as a lawyer; and the said defendant then
and there said to said Cameron, in substance, that if what she

had heard said of the said plaintiff was true, he was devoid of principle both as a man and a lawyer; that he was a bad man and unworthy to live in the place; that the foregoing conversation was had with the said Cameron, on his assurance of friendship, and that what she said should not be used to her disadvantage; that the said defendant believed the assurances of the said Cameron; that the interview with and the statements and communications made to said Cameron were made in strict confidence, relying on the professed friendship of the said Cameron; that the same and the whole thereof was a confidential communication and was made without malice and without any intent to injure said plaintiff. And the said defendant says that she verily believed the statements she made to said Cameron of and concerning the said plaintiff to be true. And the said defendant denies any knowledge or information sufficient to form a belief of the allegations contained in the said second count or cause of action, except as hereinabove admitted."

The facts, so far as material, are set forth in the opinion.

*A. J. Abbott* for appellant. The court erred in excluding testimony of plaintiff as to the decline of his business in consequence of the slanders which were largely spoken against him in his professional character as a lawyer. (*Bergmann v. Jones,* 94 N. Y. 51.) It is the province and duty of the court to decide whether the occasion was such as to have constituted the communication a privileged one, and it is within the province of the jury to find whether such privileged occasion has been abused. (*Hamilton* v. *Eno,* 81 N. Y. 122, 124.) As a general rule, there can be no privilege in a third person's interference between man and woman in their negotiations for marriage to prevent the same. (Cooley on Torts, 215n.; Townshend on Slander and Libel [3d ed.] 450; *Joannes* v. *Bennet,* 5 Allen, 170.) To constitute a justification, the absolute truth of the defamatory matter should be alleged. It is not sufficient to set up facts which only tend to establish the truth of such matter. (Townshend on Slander

and Libel, § 357 and note, and § 355, note 1 ; 51 Barb. 4.3.) The truth must be established with as much certainty as would be necessary to convict under an indictment for the same offense. (Townshend on Slander and Libel, §§ 357, 404; Abb. Trial Ev. 670, note 15.) If a material part of the justification fails, then all fail. (Townshend on Slander and Libel, §§ 359, 408.) The truth of the matter charged, to constitute a justification, must be made out beyond a reasonable doubt. The reasonable belief of the defamer has nothing to do with it as far as a justification is concerned. (Townshend on Slander and Libel, § 404 ; Abb. Trial Ev. 670, note 15 ; 6 Cow. 118 ; 16 Wend. 601 ; 3 Barb. 602.) Rumor is not available under the plea of mitigation. (Townshend on Slander and Libel, § 411 ; 1 Wend. 451 ; 5 Cow. 499.) Facts available in mitigation must be shown to be facts. (81 N. Y. 249.) Charging an attorney at law with dishonesty in his practice and profession is actionable, *per se.* (Sedg. on Damages, 673 ; Townshend on Slander and Libel, §§ 192, 198, 370.) When the language is actionable *per se* special damages need not be alleged. (Townshend on Slander and Libel, § 345.)

*James Wood* for respondents. A communication is privileged, within the rule, when made in good faith to one having an interest in the information sought, and it will be privileged, if volunteered, when the party to whom the communication is made has an interest in it, and the party by whom it is made stands in such a relation to him as to make it a reasonable duty, or, at least, proper that he should give the information. (*Sunderlin* v. *Bradstreet*, 46 N. Y. 188 ; *Lewis* v. *Herrick*, 16 id. 128, 369 ; 1 Starkie on Slander, 321 ; *Klinck* v. *Colby*, 46 N. Y. 427, 433.) This rule holds good, even though the imputations contained in the communication were false, based upon erroneous information. (*Kine* v. *Small*, 1 H. & H. 83 ; *S. C.*, 3 M. & W. 297 ; *Streely* v. *Wood*, 15 Barb. 105, 111 ; *Hastings* v. *Lech*, 22 Wend. 410 ; *Fowler* v. *Bowen*, 30 N. Y. 20 ; Moak's Underhill on Torts, 46 ; 23 Alb. L. Jour. 415 ; *Marks* v. *Baker*, 12 Rep. 530 ; Townshend on Slander and

Libel, §§ 209–241; *Joannes* v. *Bennet,* 5 Allen, 109; *Resbollam* v. *Campbell,* 5 Jur. [N. S.] 243; *Krebs* v. *Olin,* 12 Gray, 239; *Atkinson* v. *Cogswell,* 7 Fr. L. R. [N. S.] 109.)

EARL, J. The general rule is that in the case of a libelous publication the law implies malice and infers some damage. What are called privileged communications are exceptions to this rule. Such communications are divided into several classes, with one only of which we are concerned in this case, and that is generally formulated thus: "A communication made *bona fide* upon any subject matter in which the party communicating has an *interest,* or in reference to which he has a *duty,* is privileged if made to a person having a corresponding *interest* or *duty,* although it contained criminating matter which, without this privilege, would be slanderous and actionable; and this though the duty be not a legal one, but only a moral or social duty of imperfect obligation." The rule was thus stated in *Harrison* v. *Bush* (5 Ellis & Black. [Q. B.] 344), and has been generally approved by judges and text writers since. In *Toogood* v. *Spyring* (1 Cr. M. & R., [Ex.] 181), an earlier case, it was said that the law considered a libelous "publication as malicious unless it is fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs in matters where his interest is concerned"; and that statement of the rule was approved by FOLGER, J., in *Klench* v. *Colby* (46 N. Y. 427), and in *Hamilton* v. *Eno* (81 N. Y. 116). In *White* v. *Nicholls* (3 How. [U. S.] 266, 291), it was said that the description of cases recognized as privileged communications must be understood as exceptions to the general rule, and "as being founded upon some apparently recognized obligation or motive, legal, moral or social, which may fairly be presumed to have led to the publication, and, therefore, *prima facie* relieves it from that just implication from which the general law is deduced."

Whether within the rule as defined in these cases a libelous communication is privileged, is a question of law; and when

upon any trial it has been held as matter of law to be privileged, then the burden rests upon the plaintiff to establish as matter of fact that it was maliciously made, and this matter of fact is for the determination of the jury.

It has been found difficult to frame this rule in any language that will furnish a plain guide in all cases. It is easy enough to apply the rule in cases where both parties, the one making and the one receiving the communication, are interested in it, or where the parties are related, or where it is made upon request to a party who has an interest in receiving it, or where the party making it has an interest to subserve, or where the party making it is under a legal duty to make it. But when the privilege rests simply upon the moral duty to make the communication, there has been much uncertainty and difficulty in applying the rule. The difficulty is to determine what is meant by the term "moral duty," and whether in any given case there is such a duty. In *Whiteley* v. *Adams* (15 C. B. [N. S.] 392), ERLE, Ch. J., said: "Judges who have had, from time to time, to deal with questions as to whether the occasion justified the speaking or the writing of defamatory matter, have all felt great difficulty in defining what kind of social or moral duty, or what amount of interest will afford a justification;" and in the same case, BYLES, J., said the application of the rule "to particular cases has always been attended with the greatest difficulty; the combinations of circumstances are so infinitely various."

The rule as to privileged communications should not be so extended as to open wide the flood-gates of injurious gossip and defamation by which private character may be overwhelmed and irreparable mischief done, and yet it should be so administered as to give reasonable protection to those who make and receive communications in which they are interested, or in reference to which they have a real, not imaginary, duty. Every one owes a moral duty, not, as a volunteer in a matter in which he has no legal duty or personal interest, to defame another unless he can find a justification in some pressing emergency. In *Coxhead* v. *Richards* (2 Mann., G. & S.

569, 602), COLTMAN, J., said: "The duty of not slandering your neighbor on insufficient grounds is so clear that a violation of that duty ought not to be sanctioned in the case of voluntary communications except under circumstances of great urgency and gravity. It may be said that it is very hard on a defendant to be subject to heavy damages when he has acted honestly and when nothing more can be imputed to him than an error in judgment. It may be hard, but it is very hard on the other hand to be falsely accused. It is to be borne in mind that people are but too apt rashly to think ill of others; the propensity to tale bearing and slander is so strong amongst mankind, and when suspicions are aroused, men are so apt to entertain them without due examination, in cases where their interests are concerned, that it is necessary to hold the rule strictly as to any officious intermeddling by which the character of others is affected;" and in the same case CRESSWELL, J., said: "If the property of the ship-owner on the one hand was at stake, the character of the captain was at stake on the other; and I cannot but think that the moral duty not to publish of the latter defamatory matter which he did not *know* to be true, was quite as strong as the duty to communicate to the ship-owner that which he *believed* to be true."

One may not go about in the community and, acting upon mere rumors, proclaim to everybody the supposed frailties or bad character of his neighbor, however firmly he may believe such rumors, and be convinced that he owes a social duty to give them currency that the victim of them may be avoided; and, ordinarily, one cannot with safety, however free he may be from actual malice, as a volunteer, pour the poison of such rumors into the ears of one who might be affected if the rumors were true. I cite a few cases by way of illustration. In *Godson* v. *Home* (1 B. & B. 7), one Noah solicited the plaintiff to be his attorney in an action. The defendant, apparently a total stranger, wrote to Noah to deprecate his so employing the plaintiff, and this was held to be clearly not a confidential or privileged communication. In *Storey* v.

*Challands* (8 C. & P. 234), one Hersford was about to deal with the plaintiff when he met the defendant who said at once, without his opinion being asked at all, "if you have anything to do with Storey you will live to repent it, he is a most unprincipled man," etc., and Lord DENMAN directed a verdict for the plaintiff because the defendant began by making the statement without waiting to be asked.   In *York* v. *Johnson* (116 Mass. 482), the defendant, a member of a church, was appointed with the plaintiff and other members of the church on a committee to prepare a Christmas festival for the Sunday school.   He declined to serve, and being asked his reason by Mrs. Newton, a member of the committee, said that a third member of the committee, a married man, had the venereal disease, and being asked where he got it said he did not know, but that "he had been with the plaintiff," who was a woman, and it was held that this was not a privileged communication. There was no question of the defendant's good faith and reasonable grounds of belief in making the communication, and yet DEVENS, J., in the opinion said :  "The ruling requested by the defendant that the communication made by him to Mrs. Newton was a privileged one and not actionable except with proof of express malice, was properly refused.   There was no duty which he owed to Mrs. Newton that authorized him to inform her of the defamatory charges against the plaintiff, and no interest of his own which required protection justified it.   He had declined to serve upon the same committee with Mrs. York; but he was under no obligation to give any reason therefor, however persistently called upon to do so ; and even if Mrs. Newton had an interest in knowing the character of Mrs. York, as a member of the same church, it was an interest of the same description which every member of the community has in knowing the character of other members of the same community with whom they are necessarily brought in contact, and would not shield a person who uttered words otherwise slanderous."

Having thus stated the general principles of law applicable

to a case like this, I will now bring to mind the facts of this case so far as they pertain to the defamatory letter. The plaintiff was a lawyer and had been engaged in the practice of his profession at Caledonia for several months and resided there at the date of the letter. Miss Dora McNaughton and the defendant also resided there. The plaintiff was on terms of social intimacy with Dora and was paying her attention with a view to matrimony, and some time subsequently married her. Mrs. Collins was about twenty-five years old, two years and a half younger than Dora, and was married November 2, 1875; and prior to that she had always resided within a mile and a half from the residence of Dora and they had been very intimate friends. Dora had a father and no brother, and Mrs. Collins had a brother. During the time of this intimacy and at some time before the marriage of Mrs. Collins, Dora repeatedly requested of her that if she " knew anything about any young man she went with, or in fact any young man in the place, to tell her because her father did not go out a great deal and had no means of knowing, and people would not be apt to tell him," that she, Mrs. Collins, had a brother and would be more apt to hear what was said about young men, and Dora wished her to tell what she knew. Their intimacy continued after the marriage of Mrs. Collins until January before the letter was written, when a coldness sprang up between them. They became somewhat estranged and their intimacy ceased. Mrs. Collins testified that when she wrote the letter she thought just as much of Dora as if she had belonged to her family; that she had heard the defamatory rumors and believed them, and, therefore, did not wish her to marry the plaintiff. It must be observed that the request of Dora to Mrs. Collins for information about young men was not made when she was contemplating marriage to any young man, and that the request was not for information about any particular young man or about any young man in whom she had any interest; but it was for information about the young men generally with whom she associated. Nor literally construing the language, did Dora wish for informa-

tion as to the gossip and rumors afloat about young men. What she asked for was such facts as Mrs. Collins *knew* and not for her opinion about young men or her estimation of them. But if we assume that the request was for information as to all the rumors about young men which came to the knowledge of Mrs. Collins, the case of the defendant is not improved. At that time the plaintiff was not within Dora's contemplation, as she did not know him until long after. The request was not for information as to any young man who might pay her attention with a view to matrimony; it was for information about all the young men in her circle. Mrs. Collins was not related to her and was under no duty to give the information, and Dora had no sufficient interest to receive the information. Mrs. Collins was under no greater duty to give the information to Dora than to any of the other young ladies of her acquaintance in the same circle. She could properly tell what she knew about young men, but could not defame them, even upon request, by telling what she did not know, what nobody knew, but what she believed upon mere rumors and hearsay to be true. The mere fact that she was requested or even urged to give the information, did not make the defamatory communication privileged. (*York* v. *Johnson, supra.*)

But there is no proof that this letter was written to Dora in pursuance of any request made by her four years before its date, and there was no evidence which authorized the jury to find so if they did so find. On the contrary, it is clear that Dora would not, at the time, have gone to Mrs. Collins for any information as to the plaintiff if she had desired any, and that she did not wish for the information from her; and that this was known to Mrs. Collins the language of the letter clearly shows. In the defendant's answer it is alleged that Mrs. Collin's letter was prompted by her friendship for Dora and by the solicitation of " mutual friends to interfere in the matter and break off the relations which seemed to exist between the plaintiff and Dora," and there is no averment that it was written in pursuance of any request coming from Dora. The letter itself as well as the evidence of Mrs. Collins

shows unmistakably that it was thus prompted. Mrs. Collins did not testify that she wrote the letter in pursuance of any request of Dora, and the action was not tried upon that theory, and no question as to the request was submitted to the jury. The trial judge charged the jury broadly that if the relations of Dora and Mrs. Collins were of such an intimate character as to warrant the latter in warning the former "against a person whom she had reason to believe was not a fit person, and if Mrs. Collins acted fairly, in good faith, conscientiously, although mistakenly, there can be no recovery against her," upon the count in the complaint for libel; and then the court said: "Did Mrs. Collins in writing that letter act fairly, act judiciously, not in the matter of good taste, but did she with the facts which had been brought to her mind act in a conscientious and proper manner? If she did, if she acted as an ordinarily prudent person would act under the same circumstances, if she had probable ground for her belief, she was justified in writing the letter." Mrs. Collins then appears as a mere volunteer, writing the letter to break up relations which she feared might lead to the marriage of the plaintiff to Dora. If she had not been the mother of Dora, or other near relative, or if she had been asked by Dora for information as to the plaintiff's character and standing, she could with propriety have given any information she possessed affecting his character, provided she acted in good faith and without malice. But a mere volunteer having no duty to perform, no interest to subserve, interferes with the relations between two such people at her peril. The rules of law should not be so administered as to encourage such intermeddling, which may not only blast reputation but possibly wreck lives. In such a case the duty not to defame is more pressing than the duty to communicate mere defamatory rumors not known to be true.

Some loose expressions may doubtless be found in text books and judicial opinions supporting the contention of the defendant that this letter was, in some sense, a privileged communication. But, after a very careful research, I believe there

is absolutely no reported decision to that effect. The case
which is as favorable to the defendant as any, if not more
favorable than that of any other, is that of *Todd* v. *Hawkins*
(8 Car. & P. 88). In that case, a widow being about to marry
the plaintiff, the defendant, who had married her daughter,
wrote her a letter containing imputations on the plaintiff's
character, and advising a diligent and extensive inquiry into
his character, and it was held that the letter was written on a
justifiable occasion, and that the defendant was justified in
writing it, provided the jury was satisfied that, in writing it,
he acted *bona fide*, although the imputations contained in the
letter were false or based upon the most erroneous informa-
tion; and if he used expressions, however harsh, hasty or
untrue, yet *bona fide*, and believing them to be true, he was
justified in so doing. The letter was held privileged solely
upon the ground of the near relationship existing between the
widow and the defendant, her son-in-law, which justified his
voluntary interference. But the judge expressly stated that
if the widow and defendant had been strangers to each other,
there would have been a mere question of damage. A case
nearer in point is that of " *The Count Joannes* " v. *Bennett*
(5 Allen, 169). There it was held that a letter to a woman
containing libelous matter concerning her suitor, cannot be
justified on the ground that the writer was her friend and
former pastor, and that the letter was written at the request
of her parents, who assented to all its contents. The decision
was put upon the ground that, in writing the letter, the defend-
ant had no interest of his own to serve or protect; that he
was not in the exercise of any legal or moral duty; that the
proposed marriage did not even involve any sacrifice of his
feelings or injury to his affections, and did not, in any way,
interfere with or disturb his personal or social relations; that
the person to whom the letter was addressed was not connected
with him by the ties of consanguinity or kindred, and that he
had no peculiar interest in her. Some years before the same
learned court decided the case of *Krebs* v. *Oliver* (12 Gray,
239), wherein it was held that statements that a man has been

imprisoned for larceny, made to the family of a woman whom he is about to marry, by one who is no relation of either, and not in answer to an inquiry, are not privileged communications. In the opinion, it is said : " A mere friendly acquaintance or regard does not impose a duty of communicating charges of a defamatory character concerning a third person, although they may be told to one who has a strong interest in knowing them. The duty of refraining from the utterance of slanderous words, without knowing or ascertaining their truth, far outweighs any claim of mere friendship."

I am, therefore, of opinion that the letter was in no sense, upon the facts as they appear in the record, a privileged communication.

There was, also, error in the court below as to the verbal slanders alleged in the second cause of action ; and what I have already said applies, in part, to these slanders. There was no substantial denial of these slanders in the answer, and there is no dispute in the evidence that they were uttered, and there can be no claim upon the evidence that they were justified. The trial judge charged the jury that the words were slanderous. But he said to them that " there is not that presumption of malice in the case of oral slanders that there is in the case of a deliberate writing." This was excepted to by plaintiff's counsel, and was clearly erroneous. In the case of oral defamation, as in the case of written, if the words uttered were not privileged, the law implies malice.

The judge further charged the jury, in substance, that the words, if uttered under the circumstances testified to by Mrs. Collins, were privileged. She testified, in substance, that she uttered the words to Mr. Cameron in confidence, after the most urgent solicitation on his part that she should tell him what she knew about the plaintiff. But defamatory words do not become privileged merely because uttered in the strictest confidence by one friend to another, nor because uttered upon the most urgent solicitation. She was under no duty to utter them to him, and she had no interest to subserve by uttering them. He had no interest or duty to hear the

defamatory words, and had no right to demand that he might hear them ; and under such circumstances there is no authority holding that any privilege attaches to such communications.

There was no evidence that would authorize a jury to find that Cameron sought the interview with Mrs. Collins, as an emissary from or agent of the plaintiff, or that at the plaintiff's solicitation or instigation he obtained the slanderous communications from her, and he did not profess or assume to act for him on that occasion. He was the mutual friend of the parties, and seems to have sought the interview with her either to gratify his curiosity, or to prevent the impending litigation between the parties. But even if he obtained the interview with her at the solicitation of the plaintiff, and as his friend, she could not claim that her slanderous words uttered at such interview were privileged.

The trial judge, therefore, erred in refusing to charge the jury that there was no question for them as to the second cause of action but one of damages.

Therefore, without noticing other exceptions to rulings upon the trial, for the fundamental errors herein pointed out, the judgment should be reversed and a new trial granted.

Danforth, J. (dissenting). The plaintiff united in his complaint two causes of action for slander with two causes of action for libel, and a fifth cause of action reiterating, by general reference, the allegations of the preceding ones, and charging the report and publishing thereof "to divers other persons." No attention seems to have been given to this cause of action at any time during the trial, and before the plaintiff rested his counsel stated that there was a failure of proof as to the third cause of action, and it was abandoned. Nor, upon this appeal, is any point made by the learned counsel for the appellant as to the first count, and our attention is directed by him only to the disposition made by the trial judge of the questions arising on the second and fourth causes of action.

The defendant, Mrs. Collins, testified that Dora told her "repeatedly, that if I knew anything about any young man

she went with, or, in fact, any young man in the place, to tell her, because her father didn't go out a great deal, and had no means of knowing, and people wouldn't be apt to tell him; that I had a brother and I would be more apt to hear it and she wished me to tell her what I knew."

She heard Byam talked about a great deal, but no one spoke well of him, and she did not wish him to marry Dora, so she wrote the letter, sealed it, stamped it, took it to the office and mailed it. It seems Dora was then absent, but returned in a few days, and the letter was given to her in the presence of the plaintiff. She read the letter, then gave it to him. He read it and took it immediately to Dora's father, who either read it or heard it read. The plaintiff then took it to his office, sent for his friends and confidants, among others, Walker and Cameron. He read the letter to Walker and Cameron. On the same day Cameron procured the attendance of Mrs. Collins at his store, where he spoke to her about the letter, and, as she testifies, said: "Byam is going to sue you for it," and he wished to know what she "knew about Byam." In answer, as she testifies, "I told him I didn't wish to tell him; he said he wanted me to tell him just as though he was my lawyer; he said, 'I am your friend and I want you to have perfect confidence in me,' and he said, 'you know if a person employs a lawyer they tell him everything,' and I said I didn't wish to tell him; I said, 'you have heard these things yourself;' he said he didn't know, he would rather I would tell and he could tell better." She avoided and resisted his inquiries and endeavored to leave, but he persisted and "held on to the door-latch" so she could not go out, and the disclosures of that interview now form the subject of complaint as set out in the second cause of action.

The fourth count is founded upon the letter and publication already referred to. At the close of the evidence the plaintiff's counsel asked the trial court to "hold as matter of law and charge the jury, that the cause of action set out in the fourth count of the complaint was libelous and the communication not privileged; that the cause of action has been

established and the only question for the jury is the question of damages." The court declined, but, after reading the letter to the jury, and declaring it to be libelous, charged that liability for writing and publishing it might be avoided by showing that what was written was a privileged communication, and called upon them to determine whether it was of that character. The plaintiff's counsel excepted to the refusal to charge as requested and also to the submission of the question to the jury.

The whole charge must be taken together, and, so taken, it is apparent that the trial judge violated no rule of law in respect to this matter. He called the attention of the jury to the evidence as to the relations between the parties and the request by Miss McNaughton for information, and also to the statements in relation to the plaintiff which had come to the ears of the defendant, and then said: " If the relations of these persons was of such an intimate character as to warrant Mrs. Collins in warning Miss McNaughton against a person whom she had reason to believe was not a fit person, and if Mrs. Collins acted fairly, in good faith, conscientiously, although mistakenly, there can be no recovery against her upon that cause of action." And again : " I say to you, therefore, that if Mrs. Collins had heard these things and the others to which she has testified, and believed them to be true, and had reason to believe them to be true, and if she acted honestly and conscientiously in writing that letter, it is a privileged communication and there can be no recovery against her for that count." And, finally : " If you find the lady was justified in those things or she acted conscientiously and intelligently, as a reasonably prudent person would have acted in similar affairs, on account of her relationship with this lady, your verdict will be generally for the defendant." " If certain facts exist " the judge, in substance, says " the letter is privileged." Whether those facts did exist he properly left for the jury to determine. (*Stace* v. *Griffith*, 2 P. C. L. R. 420.) There was, therefore, no error in making

this disposition of the question. (*Klinck* v. *Colby*, 46 N. Y. 427; *Hamilton* v. *Eno*, 81 id. 117.)  He held the letter upon its face to be libelous, but as liability for even a libelous publication may be defeated by the occasion or circumstances under which it was made; he left those matters to be inquired of by the jury.  We have them established by the verdict and assuming their existence, the important inquiry now is whether the trial judge was right in holding the letter privileged.

The parties directly concerned in this question resided in the same town.  The defendant Mrs. Collins and Dora McNaughton (now Mrs. Byam), were from childhood neighbors and intimate friends, and at the time, made material by this inquiry, were unmarried.  The latter seems to have supposed that the former had better opportunities than herself to learn the character of the young men of that town, and requested that she would communicate to her anything she might know concerning, among others, those " who went with her," obviously indicating persons whose attentions were of the nature of addresses and given in view of matrimony.  In response to this request, as the evidence tends to show and as the jury have found, the defendant wrote the letter complained of.  Previous thereto she had uttered no word of disparagement or reproach concerning the plaintiff, and the letter itself was sealed and directed to Miss McNaughton, and in that condition delivered to her.  There was no other publication by the writer or with her assent.  Was the communication privileged?  If so, in the absence of malice, there was a perfect defense to the action so far as the fourth count is concerned.  This qualification requires no discussion, because, at the request of the learned counsel for the plaintiff, the trial judge charged the jury that " when one stands in a privileged relation, but makes a false charge, the proof is on her to disprove malice and show that she acted in good faith," thus improperly shifting the burden from the plaintiff upon whom, in the supposed case it properly lay, to the defendant to whom it did not belong.  (*Gassett* v. *Gilbert*, 6 Gray, 94; *Somerville* v. *Hawkins*, 10 C. B. 583; *Hastings* v. *Lusk*, 22 Wend. 414.)

The error was against the defendant, but that is of no importance since the jury by their verdict found that there was no malice, and that the defendant acted in good faith. It is well settled that without malice, either express or implied, an action for defamation, by words spoken or written, cannot be supported. In ordinary cases malice is implied from the slander, but there may be a justification from the occasion, and when this appears, an exception to the general rule is created, and the words must be proven to be malicious as well as false. In that aspect of the case, as already stated, the plaintiff failed. The question as to privilege is, however, yet to be considered.

The letter is one of warning or entreaty. It names no one as its subject, but it was conceded that the person referred to was the plaintiff, and he is held up in numerous phrases conveying divers degrees of disparagement and imputation, to reproach and as a person to be feared and avoided. (*Craft* v. *Boite*, 1 Saund. and note, 248.) The trial judge, therefore, ruled that it was libelous, and the appellant is entitled to have that ruling stand as the law of the case. The publication was admitted. From these circumstances the law supplied the rest, and the burden of justification or excuse was cast upon the defendant. (*Lewis* v. *Few*, 5 Johns. 35.) The question, therefore, is whether the occasion of the publication, or the circumstances prompting it, furnish a legal excuse for that act, and so repel the inference of malice arising from the matter of it, as to bring it within the exception to which I have referred. If it does, then in legal contemplation the communication is privileged. Of such communications there are two classes: In one the privilege is absolute and a shield against any action for defamation, as where the charge, even if false and malicious, is made in the course of official duty or under certain other circumstances not embracing those before us; in the other class the privilege is qualified and may be overcome by proof of malice. This class includes cases where the interest and welfare of society and common convenience require that the defendant should be permitted to speak freely

in the relation in which he is placed, provided he confines himself within the bounds of what he believes to be the truth. (*Hastings* v. *Lusk*, 22 Wend. 410.)

The law frequently referred to upon this subject is to be found in *Toogood* v. *Spyring* (1 Cromp. Mees. & Ros. 181–192), and requires that the communication to be privileged should be fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs where his interest is concerned. In *Harrison* v. *Bush* (32 Eng. L. & E. 173), substantially the same rule is restated, but it is added "that duty cannot be confined to legal duties which may be enforced by indictment, action, or *mandamus*, but must include moral and social duties of imperfect obligation," and as thus amplified, the rule is adopted in this court and may be considered as well settled (*Ormsby* v. *Douglass*, 37 N. Y. 477; *Hamilton* v. *Eno*, 81 id. 116.) A common application of the rule is to words spoken by a former master in giving a character of a servant (*Weatherston* v. *Hawkins*, 1 Term Rep. 110), or in answering an inquiry concerning the solvency of a tradesman or banker, or between persons having a common interest in the subject to which they relate. It applies, however, to other cases of the same nature, and is meant to protect the communications of business and the necessary confidence of man in man, as where one employed by a sheriff to ascertain and inform him of the facts relating to an interference with a levy upon certain cattle, wrote a letter charging the plaintiff with feloniously taking them (*Washburn* v. *Cooke*, 3 Den. 110), or where, at the request of the father, a person made inquiry as to the character of his daughter's husband. (*Atwill* v. *Mackintosh*, 120 Mass. 177.) In each instance the report, if made in good faith, and reasonably believed true, was held to be privileged. (*Atwill* v. *Mackintosh*, *supra*.) So it is said to extend to the confidential communications of friendship (Holt on Libel, 235), and will undoubtedly include every case where in the discharge of any legal, natural, or social obligation, the defendant states what he honestly believes the plaintiff's

character to · be, whatever the charges may be which he thus imputes to him. Thus, in *McDougall* v. *Claridge* (1 Camp. 267), it was held that a letter written confidentially concerning a solicitor, and under an impression that its statements were well founded, could not be the subject of an action ; and in *Heser* v. *Donson,* mentioned in Buller's Nisi Prius, page 8, where the defendant said " in confidence and friendship, by way of warning," to one about dealing with the plaintiff, words affecting his credit, no action would lie because the manner of speaking repelled the idea of malice. In *White* v. *Nicholls* (3 How. [U. S.] 286), Justice DANIEL enumerates among such communications, " words spoken in confidence and friendship as a caution," and applying the same principle to specific cases, it is laid down in a recent work on this subject (Odgers on Libel and Slander, 210), that a father, guardian, or intimate friend may warn a young man against associating with a particular individual, or may warn a lady not to marry a particular suitor, though under the same circumstances a stranger could not do so without incurring liability.

Among other instances of privilege, and of the same nature, is any communication required · by the interest of the person to whom it is made and reasonably called for or warranted by the relation in which the person making it stands to him, as a letter written in good faith by a person to his mother-in-law, warning her of the bad character of the man she was about to marry. (*Todd* v. *Hawkins*, 8 Car. & P. 88–91.) The same principle was applied in *Adcock* v. *Marsh* (8 Ired. [Law], 361.) It there appeared that Anderson Adcock was twice married. His first wife died, leaving a daughter Sally and one other. Upon his second marriage the defendant, Mrs. Marsh, advised the daughters of the first Mrs. Adcock that they ought not to live at their father's, giving reasons in words relating to the plaintiff, his then wife, which were in themselves *prima facie* actionable. In excuse it was shown that the first Mrs. Adcock " had requested the defendant Marsh, with whom she was very intimate, to give ' advice ' to her daughters," but the trial judge ruled that this was insufficient in any view to rebut the

implication of malice, and after verdict for the plaintiff a new trial was granted, the court of review holding that the communication was privileged if made by the defendant in good faith, and as to that the jury were the proper judges. The learned judge, speaking for the court and referring to the ruling of the trial judge, said : " The idea seems to have been that the communication was not a privileged one, because the defendant had no interest in the matter and stood in no relationship to the witness," the person advised by defendant, " but was in every respect a volunteer," and, after citing and commenting on various cases, says, in substance, that whether there was just cause for the opinion expressed by Mrs. Marsh or not, she was justified in making it known to the daughter if she honestly held that opinion, " and that her communication so made was a privileged one." " And we further hold," he says, " that without any request from the mother, she would under the other circumstances have been justified."

To the same effect are the cases in our own court. In *Lewis* v. *Chapman* (16 N. Y. 369), Selden, J., enunciates the rule as embracing both alternatives, and says : " There is no doubt that when the communication is made *bona fide* in answer to inquiries from one having an interest in the informa tion sought, or when the relation between the parties by whom and to whom the communication is made is such as to render it reasonable and proper that the information should be given, it will be regarded as privileged," and referring to the authorities, says, these cases show that all that is necessary to entitle such communications to be so regarded is " that the relation of the parties should be such as to afford reasonable ground for supposing an innocent motive for giving the information and to deprive the act of an appearance of officious intermeddling with the affairs of others," and although the information given in that case was volunteered, and not in answer to any inquiry, the judges all agreed that the relations existing between the person addressed and the defendant, rendered the communication privileged. In the later case of *Sunderlin* v. *Bradstreet* (46 N. Y. 128), it appeared that the defendants, of their

own volition and for their own profit, collected information concerning the condition of traders, and this they communicated to subscribers not interested in the matter, and the court, reiterating the rule laid down in *Lewis* v. *Chapman* (*supra*), held that, owing to that want of interest in the person addressed, the communication was not privileged. Protection would seem to be due, therefore, to communications between persons having relationship, whether by blood or marriage, or as principal and agent, attorney and client, or as intimate friends, or as the result of any trust or confidence, provided such communications are fairly warranted by a reasonable occasion and honestly made.

It follows that the term malice, in a legal sense, has no application where there is a just cause or occasion for speaking the words complained of, although under other circumstances they would constitute a slanderous charge. (*Jones* v. *Givin*, Gilbert's Cas. 185; *Washburn* v. *Cooke*, and other cases, *supra*.) In discussing this question the learned judge, already quoted, says: " When the circumstances show that the defendant may reasonably be supposed to have had a just and worthy motive for making the charge, then the law ceases to infer malice from the mere falsity of the charge and requires from the plaintiff other proof of its existence." (*Lewis* v. *Chapman*, *supra*.) The facts found by the jury, and above adverted to, bring the case at bar within the principle and the rule thus stated. The occasion was the courtship of the plaintiff, and the object of the letter was to give information of his character. It was written in confidence and in friendship to one sought by him in marriage, and thus having a vital interest in the subject, and written also in response to her request. These conditions seem to answer the first branch of the proposition laid down by Judge SELDEN in the *Chapman Case* (*supra*), and by Judge ALLEN in the *Sunderlin Case* (*supra*), and also bring the communication directly within the other branch of the rule. If we regard the communication as volunteered, it still remains that Dora, the party to whom the communication was made, had an interest in it, and the writer stood, by

reason of her intimate friendship and request, in such relation to her as to make it, at least, proper that the defendant should warn and put her on further inquiry.

I think the communication was privileged by the occasion and by the position of the writer, and the court committed no error in refusing to charge otherwise. Whether the letter was in excess of privilege so conferred, I need not inquire, for such question was for the jury and it was not raised at the trial.

As to the second cause of action, the counsel for the appellant asked the court to charge: "That the charges set out in the second count of the complaint have been substantially proved and stand uncontradicted, and the plaintiff is entitled to recover, and the only question for the jury is one of damages. The court declined so to hold and charge, and plaintiff's counsel duly excepted." In this there was no error:

1st. The allegations of the complaint are not admitted by the answer, but denied, and the plaintiff went into evidence to sustain the issue.

2d. Between the plaintiff's witnesses and the evidence of the defendant there was a conflict.

3d. The communication to Cameron was given in confidence, at his request, and under circumstances which might very well lead to the conclusion that Cameron, as the friend or even agent of the plaintiff, was by him put upon an inquiry, suggested by the letter just before read to him by the plaintiff. (*Weatherstone* v. *Hawkins, supra ; King* v. *Waring,* 5 Esp. [N. P.] 13.) The statement was not voluntary, and the occasion of speaking, as well as the words spoken, were to be considered. The submission of it to the jury was proper (2 Greenl. on Ev. § 421), and the language of the judge as applied to it was not inappropriate. (*Weatherstone* v. *Hawkins, supra.*)

4th. Nor was it necessary to plead specially that the communication to Cameron was privileged. The defendant's answer alleged that the communication, such as it was, to Cameron was drawn out by him — "was a confidential com-

munication and was made without malice and without any intent to injure the plaintiff," and in the belief of its truth, and denied, among other things, the allegation of malice contained in the complaint. This goes to the very root of the action. If true, it shows there was no malice ; and as formerly the defense of privilege was open under the general issue (*Hastings* v. *Lusk, supra ; Howard* v. *Thompson,* 21 Wend. 324), so it is now under the denial.

The learned counsel for the appellant argues that the plea of justification set up as a separate defense was insufficient, because, he says, "the matters alleged are stated to have been known at the commencement of the action, and not at the time of uttering or writing the words attributed to the defendant." No objection was made to evidence on that account, and the question was only presented to the trial judge as he was about to give the case to the jury, and then in these words : "That the court should hold as a matter of law that there is no sufficient plea of justification set up in the defendant's answers, and the proofs have not sufficient force to sustain a justification."

The proof shows that the defendant had heard the matters referred to when she wrote the letter, and no objection was made that the evidence was not competent under the answer. But the request when made was double and required the court to pass upon the sufficiency of the evidence to sustain the justification as well as its final presentation upon the pleadings. One branch was for the jury, and upon both grounds the refusal of the court may stand. The other questions presented by the appellant were properly disposed of by the General Term.

The judgment appealed from should, I think, be affirmed.

All concur with EARL, J., for reversal, except DANFORTH, J., dissenting.

Judgment reversed.