Rude, Appellant, vs. Nass, Respondent.

*March 3 — March 17, 1891.*

*Libel: What communication privileged: Instructions.*

1. At the request of a father, who had caused the plaintiff to be arrested for the seduction of his daughter, a third person wrote to the defendant making inquiries as to the character of the plaintiff, and received in reply the letter alleged to be libelous. On appeal from a judgment for defendant in an action of libel founded thereon, *held* that, as the person who received the letter was acting for the father, he was so interested in the matter as to make it conditionally privileged, and that it was proper to instruct the jury that, if defendant wrote it in good faith and without malice, it was a privileged communication.

2. As to the charge in the alleged libel, that the plaintiff was an habitual drunkard, the court charged the jury that this meant more than being drunk several times within a given period; that it meant such use of liquor as to unfit a man in some manner for the conduct of his business, adding: "But you can perhaps define it as well as the court." *Held*, that the latter remark was not calculated to mislead the jury, and was not error.

APPEAL from the Circuit Court for *Grant* County.

The following statement of the case was prepared by Mr. Justice CASSODAY:

It appears from the record that the defendant has been a minister in various Norwegian Lutheran churches ever since 1866. That at the time of the trial the plaintiff was thirty-one years of age, and had been a teacher of vocal music for several years at various places. That from the spring of 1884 until some time in 1885 he led the singing in one of the defendant's congregations, and also taught singing school at the same place or in the vicinity. That in the fall of 1885 he went to Crawford county, and in the early spring of 1886 to Washington Prairie, Winnesheik county, Iowa, where he continued his vocation. That while there, and on July 26, 1886, he was arrested and brought

Rude vs. Nass.

before a justice of the peace on the charge of having wilfully, unlawfully, and feloniously seduced, debauched, and carnally known a daughter of the complainant, an unmarried female of previous chaste character. That under date of July 30, 1886, a letter, of which the following is a copy, was written in behalf of the father of the girl, and sent from said Washington Prairie to the defendant at Boscobel, Wis., to wit:

"Rev. O. Nass — Highest Honored: I have learned that a person by the name of J. E. N. Rude, or, as he has called himself, J. E. Nelson, has been a resident among your congregations. As the same person has lived around here, and his conduct here was such that we had to have him arrested, I should be pleased to get all the information from you in regard to his conduct while he lived in your congregation, and that you will keep nothing secret as to what you know about this man, and that you will tell me whether he had any family relations down there. All information you can give will be of great interest to us in an important case.                    Respectfully,

"[Signed]        O. H. SIVESIND, Postmaster.
"Washington Prairie, Iowa."

That in answer to that letter, and under date of August 3, 1886, the defendant wrote in the Norwegian language, and sent from Boscobel, to the person named, at said Washington Prairie, a letter of which the following is a copy, to wit:

"O. H. Sivesind, Washington Prairie, Iowa — Mr. O. H. Sivesind: In regard to your communication of the 30th, I will inform you as follows: The person concerned, namely, J. E. N. Rude, *alias* J. E. Nelson, *alias* Johan Nilsen, came here in my congregations in the spring of 1884, and was then unknown, he pretending to be a teacher in vocal music, and as such teacher to have practiced at various places, and latest at Wiota; that he had formerly been school teacher

with Meus and A. H. Preuss, but in latter time had wholly devoted himself to the teaching of vocal music, and wished to organize a singing class here amongst the young people. As he had no recommendations to show, he promised within the time of next service — four weeks — to procure such from Meus and Preuss and other places.   By the aid of his serpent-like faculty, he sneaked himself, in my absence, into the favor of a couple of families, and by their assistance had gathered some young people about him for instruction.   By the good promises that his recommendations should soon be at hand, I deferred it for a while, but never did they come. Inasmuch as he understood the tact to make himself intimate, especially with the female sex, he became more and more impudent.   In my absence he beat his way to the access of the church where the young people, boys and girls, gathered in a wild disorder, until late at night.   When I was informed by the trustees and church warden in regard to this, and in the mean time was warned in regard to this man by a couple of neighboring ministers, where he had been making trouble before, a meeting of the congregation was called, and a stop was made to this disorder in every respect.   It was substantiated that as often as he had an opportunity the saloon was the place of his resort, where he sought to gather the young people about him, not to speak of his sprightly and lascivious conduct in other directions.   As he didn't succeed, he attempted and tried in every way, by the assistance of a few adherents, who looked upon him as a dear companion, to establish a party in the congregation, especially among the young people, whom he, by his merry gatherings, plays, drinking, and night-brawling, tried to entice, and created thereby conflict and misery for a time until after we had obtained evidence from the congregations in Wiota, Jordan, Yellow Stone, Perry, Blue Mounds, and from H. A. Preuss, all tending to show a morally corrupt character.   A meeting of the congrega-

Rude vs. Nass.

tion was held July 29th, last year, when his immoral con-
duct, both in the past and present, was established, and
some of his adherents subjected to church discipline, and
himself ordered to leave. He is a perfect counterpart of
that who, a couple of years since, was notorious Dr. Brock,
with the exception that he has not had the opportunity to
commit the same deeds in every respect. In reference to
the evidence on file from other places, and by reason of his
conduct here, his certificate of character from this place
will be that he is a person of an in a high degree immoral
character, an habitual drunkard, a fighter, dishonest in his
trade, lascivious and frivolous in his conduct, whose words
are not to be believed. Wherefore everybody are warned
from having anything to do with him, and least of all is he
to be recommended in any manner whatever as a teacher
and instructor for the Christian youth. Some time last fall
my congregation in Otter Creek published a warning to
the public in the newspapers, and upon the inquiry of one
M. J. Toyen of Woodville, Winnesheik county, Iowa, I
have given the same admonitory information as here. He
does not stand in any family relations here,— at any rate
not legitimate. The rumors or reports are current that he
has a wife and child in Norway, and also a child some place
in northern part of Wisconsin; but I have no evidence to
that effect, though I hold none of it impossible. [Signed]
Friendly, O. Nass. P. S. In certificate from H. A. Preuss
it is stated that he has absconded from there, leaving a debt
which he owes a person of his congregation, who loaned
him money to save arrest for disturbance in a saloon. You
will do well if you could place his conduct before the pub-
lic as a warning for others. His organ transactions I will
pass by. Everybody must be on his lookout."

July 28, 1888, the plaintiff commenced this action of
libel, based upon the letter so written by the defendant.
The answer of the defendant admits the writing and send-

ing of the letter, but denies that he was actuated by malice
or ill will towards the plaintiff, and alleges the facts and
circumstances under which the letter was written and sent,
and that the letter was a privileged communication, made
in good faith, and in full belief of its truth; and also, in
justification thereof, alleged that the communication was
true, and pleaded specially the facts and circumstances
showing its truth.

At the close of the trial the jury returned a verdict in
favor of the defendant, and from the judgment entered
thereon the plaintiff brings this appeal.

For the appellant there was a brief by *Bashford,
O'Connor & Polleys*, and an oral argument by *E. M. Lowry*
and *T. A. Polleys*. They contended that it was the duty
of the court to determine whether defendant's letter was
privileged, and not leave it to the jury. Newell on Def-
amation, etc., 478; *State v. Griffith*, L. R. 2 P. C. 420;
*Spill v. Maule*, 4 Exch. 232; *Henwood v. Harrison*, L. R. 7
C. P. 626; *Somerville v. Hawkins*, 10 C. B. 583; *Clark v.
Molyneux*, 3 Q. B. D. 237; *Lewis v. Chapman*, 17 N. Y. 372;
*McIntyre v. McBean*, 13 U. C. Q. B. 540; *Gassett v. Gil-
bert*, 6 Gray, 98; *Hamilton v. Eno*, 81 N. Y. 116; *Klinck
v. Colby*, 46 id. 427, 431; *Brow v. Hathaway*, 13 Allen, 239;
*Coxhead v. Richards*, 2 C. B. 569; *Taylor v. Hawkins*, 16
Ad. & E. (N. S.) 308. The letter was not written concern-
ing any subject in which the defendant had any interest,
or any duty to perform, or to a person having such an in-
terest, and therefore was not privileged. *Joannes v. Ben-
nett*, 87 Mass. 169; *Noonan v. Orton*, 32 Wis. 106; *Harrison
v. Bush*, 5 E. & B. 344; *Whitely v. Adams*, 15 C. B. (N. S.)
392; *Bradley v. Heath*, 12 Pick. 163; *Shurtleff v. Parker*,
130 Mass. 293. It was not intended to be confidential,
but to be made public. *Sewall v. Catlin*, 3 Wend. 291;
*Sunderlin v. Bradstreet*, 46 N. Y. 188; *Bacon v. Mich.
Cent. R. Co.* 66 Mich. 170; *Pollasky v. Murchener*, 46 N. W.

Rep. (Mich.), 6; *Beardsley v. Tappan*, 5 Blatch. 497; *Tench v. Great Westn. R. Co.* 32 U. C. Q. B. 452. Its intemperance of language was sufficient to destroy the privilege, if it was entitled thereto. *Fryer v. Kinnersley*, 15 C. B. (N. S.) 422. The terms "habitual drunkard" should have been defined by the court, and not left for the jury to define. Thompson on Trials, sec. 1075; *Brady v. Cassidy*, 104 N. Y. 147; *Duncan v. Brown*, 15 B. Mon. 186.

For the respondent there were briefs by *Brooks & Blanchard*, attorneys, and *Olin & Butler*, of counsel, and oral argument by *J. M. Olin* and *T. J. Brooks*. To the point that the defendant's letter was privileged, they cited very numerous cases, many of which were also cited by the appellant and by the court.

CASSODAY, J.    The printed case, like many others, is unnecessarily voluminous.    It contains over 300 pages of testimony. It should *only* "consist of a sufficient statement of the return" to intelligently present the question relied upon for a reversal.    Sup. Ct. Rule VIII.

The principal point upon which the plaintiff seeks a reversal is the portion of the charge relating to privileged communications.    After stating the general nature of communications which were absolutely privileged and those which were only privileged conditionally, depending upon the circumstances under which they were made, the trial judge charged the jury as follows: "I instruct you as a matter of law that, if this letter of the 3d of August, 1886, was written by this defendant believing it to be true, in good faith, without malice, then it was a privileged communication, and this action cannot be maintained. It is the end of the case if you should find that it is a privileged communication under this rule that I have given; and so you will examine the evidence upon that point." He then calls their attention to the "vast amount of evidence in the

case," and directs them to consider it all, and determine whether the communication was made "in good faith, believing it to be true, and without malice." The verdict determined that question in favor of the defendant, and the evidence is sufficient to support the verdict. Upon the same question the court refused to charge that, "in order to make an article privileged, *two things must concur:* (1) The party making the charge must make it *bona fide,* and without malice, and with reference to some subject-matter in which he *has an interest,* or in reference to which he *has a duty* to perform; (2) it must be made to a person *having a corresponding interest and duty.* There is nothing disclosed by the evidence in this case which shows that the relation of the defendant to the plaintiff or to Sivesind, to whom the defendant wrote the letter, which would make the occasion of the publishing of the alleged libel privileged." The important question, therefore, is whether there was error in submitting to the jury the questions of malice, good faith, and belief in the truth of the communication, or in giving the portion of the charged quoted, or in thus refusing to charge as requested.

The learned counsel on both sides agree to the rule as stated by FOLGER, C. J., and held in New York, "that it is for the court to determine whether the subject-matter to which, the alleged libel relates, the interest in it of the author of it, or his relations to it, are such as to furnish an excuse; but that the question of good faith, belief in the truth of the statement, and the existence of actual malice, remain for the jury." *Hamilton v. Eno,* 81 N. Y. 122. Under this rule, the question whether the alleged libel was conditionally privileged was, manifestly, a mixed question of law and fact, to be submitted to the jury under the charge of the court. That is what was done in this case. But counsel contend, in effect, that, assuming, as we must, upon the verdict, that the defendant wrote and sent the let-

ter believing it to be true, in good faith, and without malice, yet the circumstances were not such as to make it privileged. They contend that, in order to be privileged, the defendant should have had an interest in the subject-matter of the letter, or some duty to perform in reference thereto, and also that the person to whom it was addressed should have had a corresponding interest or duty; and they cite decisions of learned courts in support of such contention. Some of those decisions, however, are inconsistent with others made by the same courts.

In *Noonan v. Orton*, 32 Wis. 112, Dixon, C. J., approvingly quotes the language of Shaw, C. J., as follows: "Where words imputing misconduct to another are spoken by one having a duty to perform, and the words are spoken in good faith, and in the belief that it comes within the discharge of that duty, *or* where they are spoken in good faith to those who have an interest in the communication, and a right to know and act upon the facts stated, no presumption of malice arises from the speaking of the words, and therefore no action can be maintained in such cases without proof of express malice." *Bradley v. Heath*, 12 Pick. 164. These cases were cited approvingly in *M. P. R'y Co. v. Richmond*, 73 Tex. 575. This alternative statement only makes it necessary that there be an interest or duty on the part of the person making the communication, or on the part of the person to whom it is made, in order that it be conditionally privileged. There are certainly many cases holding that such communication may be conditionally privileged if made to one having an interest in and a right to know and act upon the facts therein stated. *Weatherston v. Hawkins*, 1 Term R. 110; *Toogood v. Spyring*, 1 Cromp. M. & R. 181; *Kine v. Sewell*, 3 Mees. & W. 297; *Robshaw v. Smith*, 38 Law T. (N. S.), 423; *Waller v. Lock*, 45 Law T. (N. S.), 242; *Tompson v. Dashwood*, L. R. 11 Q. B. Div. 43; *Atwill v. Mackintosh*, 120 Mass. 177;

*Sunderlin v. Bradstreet,* 46 N. Y. 191; *Bacon·v. M. C. R. Co.* 66 Mich. 166.

Thus, in *Robshaw v. Smith, supra,* it was said by GROVE, J., speaking for the court: "The defendant did not act as a volunteer, but was applied to for information. When applied to, he did give such information as he possessed. He might have refused to give that information. He had no legal duty cast upon him to give any opinion. But he was entitled to give his opinion when asked, and, *a fortiori,* as it seems to me, to show any letters he had received bearing on the subject. . . . Every one owes it as a duty to his fellow-men to state what he knows about a person, when inquiry is made; otherwise no one would be able to discern honest men from dishonest men. It is highly desirable, therefore, that a privilege of this sort should be maintained." LINDLEY, J., was of the same opinion, and said: "I think it would be a lamentable state of the law, if, when a person asks another for information, that other could not give such information as he possessed without exposing himself to the risk of an action." Upon a review of the authorities, that case and these expressions were fully sanctioned by JESSEL, M. R., in *Waller v. Lock, supra,* who went still further, and said: "If the answer is given in the discharge of a moral and social duty, or if the person who gives it believes it to be so, that is enough. It need not even be an answer to an inquiry, but the communication may be a voluntary one. The law is concisely stated by LORD BLACKBURN . . . thus: 'Where a person is so situated that it becomes right in the interests of society that he should tell to a third person facts, then, if he *bona fide* and without malice does tell them, it is a privileged communication.' It appears to me, that if you ask a question of a person whom you believe to have the means of knowledge about the character of another person with whom you wish to have any dealings whatever, and he

answers *bona fide,* that is a privileged communication.  I might illustrate this by the instances . of inquiries being made of a friend or a neighbor about a tradesman, a doctor, or a solicitor.   Society could not go on without such inquiries.   The whole doctrine of privilege must rest upon the interest and the necessities of society.   If every one was open to an action of libel or slander for the answers he might make to such inquiries, it would be very injurious to the interests of society."   The eminence of that late learned master of the rolls, who thus expressed the opinion of the court, and the confusion among some of the adjudications, seem to justify the lengthy quotation made.

In view of these authorities, and others which might be cited, it seems to us that the father of the girl who made the complaint upon which the plaintiff had been arrested had an interest in the communication sent by the defendant, and had the right to know and act upon the facts therein stated; and hence, had the letter been written by the defendant in answer to inquiries made by the father personally, it would have been conditionally privileged.   The mere fact that the letter was written by the defendant in answer to inquiries made by another for and in behalf of the father does not take away the privileged character of the communication.   This is manifest from some of the authorities cited.   We must hold that there was no error in submitting the case to the jury on the theory that the communication was conditionally privileged.   The court also, under the alleged justification in the answer, submitted to the jury the question whether all the charges contained in the letter were true, with specific directions to find for the plaintiff if any one of them was false.   The verdict, in effect, found them all true, and there appears to be sufficient evidence to support the verdict in that regard.

Exception is taken because the court charged the jury as follows: "I think an habitual drunkard means more than

being drunk on two or three occasions within a given time,—two or three times within a given number of months; that it means the use of intoxicating liquors to such an extent as to in some manner disqualify a man from pursuing his avocation; *but you can perhaps define it as well as the court.*" It is claimed that this last clause left the jury to define for themselves the words "habitual drunkard." The court had, however, already defined those words sufficiently favorably to the plaintiff, and what was added was merely to indicate that the words were not such as to admit of a precise definition, though well understood by the public. Manifestly the jury were not misled by the charge. We find no material error in the record.

*By the Court.*— The judgment of the circuit court is affirmed.