LYMAN G. JUDD vs. EDWARD H. MCCORMACK & another.[1]

No. 87-453.

Middlesex.    May 11, 1988. — March 28, 1989.

Present: PERRETTA, DREBEN, & KASS, JJ.

*Libel and Slander. Privileged Communication. Malice.*

The chief of training at the Massachusetts Firefighting Academy and an instructor at the academy were afforded a conditional privilege with respect to allegedly defamatory statements made to a municipality's appointing authority regarding an academy recruit's performance and qualifications as a fire fighter. [173]

In an action by a provisional fire fighter for a town against an instructor and the chief of training for the Massachusetts Firefighting Academy alleging that a letter and an evaluation by the defendants concerning the plaintiff's lack of qualifications as a fire fighter were false and malicious, and resulted in his dismissal from his position, the evidence was insufficient to show that the defendants had abused their conditional privilege to make the allegedly defamatory statements, where the letter and evaluation constituted nonactionable statements of opinion, and were not shown to have been made with actual malice, or recklessly. [173-176]

CIVIL ACTION commenced in the Superior Court on July 5, 1977.

The case was tried before *J. Harold Flannery*, J.

*William H. Carroll*, Special Assistant Attorney General (*Antonette S. Fernandez* with him) for the defendants.

*Dennis Paul Phillips* for the plaintiff.

PERRETTA, J. When Judd was dismissed from his position as a provisional fire fighter for the town of Arlington because of his alleged poor performance at the Massachusetts Firefighting Academy (Academy), he brought this action against the defendant McCormack, the chief of training at the Academy,

[1] Jerome F. Byrne.

and seven of his instructors.[2] He claimed that their statements concerning his lack of qualifications as a fire fighter were false and malicious, and he sought damages for the intentional interference with his advantageous relationship with Arlington. The jury found in Judd's favor only as to two of the defendants, McCormack and one of the instructors, Byrne. On their appeal we conclude that Judd failed to sustain his burden of showing that McCormack and Byrne had abused the conditional privilege by which their remarks were protected. We reverse and order the entry of judgments dismissing the complaint against them.

I. *The Evidence.*

We relate the evidence in a light most favorable to Judd. See. *Tosti* v. *Ayik*, 394 Mass. 482, 494 (1985). When Judd received his provisional appointment to the Arlington fire department in January, 1977, it was with the understanding that the appointment was to be made permanent upon his satisfactory completion of a six-month probationary period and a seven-week training course at the Academy. The Academy receives fire fighting recruits from local fire departments throughout the Commonwealth for training purposes. See G. L. c. 6, §§ 164 and 165 (now see also § 165A, added by St. 1986, c. 670, § 1). When Judd attended the Academy, McCormack, as chief of training, was assisted by two deputy chiefs (one of whom was Mararian, see note 2, *supra*), twelve to eighteen staff members, and about 150 certified part-time instructors. These instructors were fire fighters, from various fire departments, who gave the recruits the benefit of their experience and knowledge concerning fire fighting techniques.

Training at the Academy consisted of two components, classroom instruction and field drills and exercises. In addition to receiving numerical grades on written examinations, each recruit's performance, in the classroom and on the field, was

---

[2] The deputy chief of training at the Academy, Harold E. Mararian, was also named as a defendant. However, he died prior to trial, which did not commence until 1986, about nine years after the complaint was brought. The action against him was dismissed upon stipulation of the parties.

evaluated by the instructors. Poor evaluations could result in demerits which, in turn, could lead to an individual counseling session. The degree of counseling would intensify as a recruit's tally of demerits increased from twenty-five to fifty to seventy-five. An accumulation of 100 demerits could result in a recruit's dismissal from the Academy.

At the end of the training program and just before graduation, the Academy would prepare a letter for each recruit's city or town appointing authority in which the recruit's performance and qualifications as a fire fighter would be described and assessed. As was known by the Academy, the letters had a major impact on the recruits' prospects for permanent employment. Although signed by McCormack as chief of training, the letters were actually prepared and written by Mararian on the basis of the instructors' written evaluations which were turned in to him. After drafting the individual letters, Mararian would leave them with McCormack for his signature. McCormack did not engage in any actual instruction and did not know any of the recruits personally. He would sign the letters without conferring with Mararian, the instructors, or the recruit.

In his letter concerning Judd, McCormack does point out his very high numerical grades on the written examinations. He notes, however, that Judd received twenty-eight demerits, which was eight more than the class average. The most critical and detrimental portions of the letter pertain to Judd's "performance of the required physical phases of training." Here Judd was described as showing "reluctance to cooperate with the Instructors, report on time . . . [and] a general lack of discipline," displaying a "tendency when under pressure to show stress and become confused . . . [and] not being able to function effectively in a fire involved area or smoke filled environment," and as "constantly attempt[ing] to let someone else do the necessary work whenever possible." The final sentence of the letter reads: "It is the opinion of the training staff at the Massachusetts Firefighting Academy that Firefighter Judd has not shown the necessary psychological and physiological skills necessary to perform effectively as a firefighter."

Any praise of Judd by his instructors in their written evaluations of him was limited to his intelligence and mastering of the classroom materials. There was consensus among them concerning Judd's performance in the classroom and on the field. As samples, they wrote: "always questions the instructor why it is done that way and gives with an alternative method, which usually doesn't work anyway," "when instructed in the proper way of doing things he always had another method which he was convinced was better," "will not volunteer and when assigned on a company operation he always seems to get the easiest job," "willing to let others 'go first,'" "not capable of much physical dexterity," "not cut out to be a firefighter . . . would not want this man on the fire ground under pressure," and "when faced with an emergency situation he has a tendency to back down . . . is content to stay in the background running the pump or pulling hose, but unwilling to take part in the actual fighting of a fire." Two of the instructors also found him lacking in punctuality. Byrne's evaluation was expressed in language which could be characterized as harsh: "Always has a question which does not pertain to what is being taught, tries to impress people with 50 cent words, in plain english a . . . [expletive deleted]. Under fire conditions has no . . . [expletive deleted], if you put a chain around him and drag him around, he might make a good man in 100 years. Not someone I would like to have on my crew. Will be the F. Lee Bailey of the fire house."[3]

Those instructors called to testify at trial all related that Judd asked many questions in class, sometimes in a challenging manner. They claimed that, on the field exercises, he would leave his assigned position, that he would not volunteer or participate in drills unless required to do so, and that his performance was seriously lacking in critical areas.

Judd explained, rather than disputed, the occurrence of the incidents cited by his instructors. He explained that when he

---

[3] As explained by Byrne upon cross-examination, that term is a slang expression for a fire fighter who is always asking questions. In the same vein, another instructor wrote that Judd would "make one hell of a firehouse lawyer."

entered the Academy in 1977, he brought with him some train-ing and experience in fighting fires. While in the United States Air Force from 1964 through 1968, he had been a member and then chief of his Air Force base fire fighting unit. His many questions were motivated by his desire to reconcile the differences between Air Force and Academy fire fighting methods.[4] Judd acknowledged that he frequently was one of the last recruits to enter a classroom and that one instructor asked him to try to be more prompt. However, he was actually late only three or four times, and each for a reason: trouble with his contact lenses, a fall on the ice, and the flu.

Judd answered to the criticisms of his field performance as follows. Opportunities to volunteer for drills were rare and participation was mostly on an assigned basis. He performed a pit fire drill as required. When not involved in the pit fire drill, he took photographs of that exercise as souvenirs for himself and his classmates, and he was allowed to do so.

There was no dispute that it was important for the members of a hose-line team to maintain their assigned positions along the line. In this way, each team member knows exactly where the others are and what they are doing. There was also no dispute that Judd broke from his position several times. Judd explained each incident. As his team was bringing a hose-line into a burning building, the recruit working the water pump called out for instructions. Judd left his position, ran back to the recruit, and explained the valves and pressure problems. By the time he returned to his assigned position, his team had brought the hose up the stairs.

On the second occasion, Judd was in the fourth position as his team was bringing a hose up a stair well. They were to enter a room at the top of the stairs and extinguish a fire. They had gone several flights when the hose failed to give. Judd called down the stair well for someone to untangle the hose,

---

[4] One of Judd's classmates testified that, although Judd had asked many questions in class, he did not view Judd's questions as disruptive to the lectures. None of the instructors who testified thought Judd's questions foolish as much as they thought them too frequent, mostly irrelevant to the methods being taught, and very time consuming.

but no one responded. He left his position, ran down the stairs, and untangled the hose. By the time he was able to return to his place on the line, his team had entered the room, opened the windows, and started to extinguish the fire.

In another, but similar, exercise Judd's team was attempting to enter a smoke-filled room. He was in the second or third position on the hose-line. He heard people yelling "ventilate, ventilate" and felt a hard slap across his back. He construed the calls and slap as a command. He left the hose-line, entered the room, and opened the windows to release the smoke. He returned to the hose-line, taking the last, rather than his original, position. He thought it inappropriate to assume his assigned place because his team members had moved up on the line to take his empty place.

Turning to the criticism of his ability to deal with fire and flammable liquids, Judd related that in this drill, he was the "nozzleman." His team was without breathing equipment when they entered a room thick with black smoke. Judd followed procedure and sprayed fine mist about the ceiling to cool or extinguish the fire. There were noxious fumes and Judd called out to an instructor that flammable liquids were present. The instructor ordered the team to back out from the room and leave the fire for a team with appropriate breathing apparatus.

As for a complaint from a classmate that Judd had failed to maintain his position and hold a ladder secure as the recruit descended the exterior wall of a building, Judd stated that he was holding the ladder. He agreed that it was a bit shaky but only because his feet were slipping on the snow and ice.

Judd related one incident, early in the training course, where he deservedly received harsh criticism. Judd was not a participant in a drill in which a recruit was to drive a fire truck to a hydrant. From his observation point, Judd thought that the truck was not close enough to the hydrant for the hose to be attached. He called out for the driver to pull up some more. At the time he called out, he was unaware of the fact that another recruit was stepping from the back of the truck with the hose. Judd stated that although he was only trying to help his classmates, he later realized that he had put a member of

the participating team in danger by his involvement. He learned much from the incident and viewed that criticism as helpful.

II. *Existence of a Privilege.*

Judd has alleged from the outset that the statements in McCormack's letter and Byrne's evaluation were false and malicious. McCormack and Byrne have insisted that their statements were true and absolutely privileged. There can be no dispute that a privilege existed, and the question here is its scope.

We agree with the trial judge's conclusion that the protection afforded the defendants was conditional, rather than absolute. See *Vigoda* v. *Barton*, 348 Mass. 478, 484 (1965); *Ezekiel* v. *Jones Motors Co.*, 374 Mass. 382, 385-386 (1978); *Bratt* v. *International Business Machs. Corp.*, 392 Mass. 508, 509 (1984). Next we note that "[w]ith a qualified or conditional privilege, a defendant is protected unless he abuses the privilege. See *Retailers Commercial Agency, Inc., petitioner*, 342 Mass. 515, 520-522 (1961); *Galvin* v. *New York, N.H. & H.R.R.*, 341 Mass. 293, 297 (1960)." *Ezekiel, supra* at 385. See also Restatement (Second) of Torts § 599 (1977). Once the defendants met their burden of showing the existence of a conditional privilege, see *United Truck Leasing Corp.* v. *Geltman*, 26 Mass. App. Ct. 847, 852 (1989), it became incumbent upon Judd to show that they had abused and thereby lost their protection against liability. See *Doane* v. *Grew*, 220 Mass. 171, 182 (1915); *Bander* v. *Metropolitan Life Ins. Co.*, 313 Mass. 337, 343-344 (1943); *McCone* v. *New England Tel. & Tel. Co.*, 393 Mass. 231, 236 (1984). See also Prosser & Keeton, Torts § 115, at 835 (5th ed. 1984) ("Once the existence of the privilege is established, the burden is upon the plaintiff to prove that it has been abused . . . ").

III. *Abuse of the Privilege.*

We apply the law to the evidence taken in the light most favorable to Judd to determine whether it was sufficient to show that McCormack and Byrne had abused their conditional privilege. The statements, as well as the circumstances under which they were made, must be considered. "Our cases have recognized that a conditional privilege may be abused, and

lost, in a number of ways. See Restatement (Second) of Torts § 599 comment a, at 286 (1977). In *Tosti* v. *Ayik*, 386 Mass. 721, 726 (1982), we stated: 'One manner of such abuse is publication with knowledge of falsity or with reckless disregard of the truth.' In *Sheehan* v. *Tobin*, 326 Mass. 185, 192 (1950), we stated: 'The rule long established by this court is "that an occasion which would justify such a communication may be abused in such a manner as to deprive the party making it of the excuse of privilege. . . . The jury may . . . [find for the plaintiff] from proof that the defendant knew the charges to be false, or had no reason to believe them to be true [and] also from the terms in which the communication is made."' *Id.*, quoting *Atwill* v. *Mackintosh*, 120 Mass. 177, 183 (1876). Cf. *Ezekiel* v. *Jones Motor Co.*, 374 Mass. 382, 390-391 (1978) (defendant employer could lose privilege of communicating reasons for plaintiff's discharge to union grievance board if statements made out of actual malice or reckless disregard for plaintiff's rights). The policy reasons behind the recognition of a conditional privilege impel us to conclude that whatever the manner of abuse, recklessness, at least, should be required." (Footnotes omitted.) *Bratt* v. *International Business Mach. Corp.*, 392 Mass. at 514-515.

Turning first to the statements themselves, we note that even though Judd's claim is one for the intentional interference with an advantageous relationship, it is based upon what Judd alleges to be defamatory, or false and malicious, statements. The evidence shows as matter of law, however, that McCormack's letter and Byrne's evaluation are "nonactionable statements of opinion." *Aldoupolis* v. *Globe Newspaper Co.*, 398 Mass. 731, 733 (1986). See also *Myers* v. *Boston Magazine Co.*, 380 Mass. 336, 341 (1980); *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 709 (1987). McCormack's letter expressly sets out the basis for the opinion and "does not imply the existence of undisclosed facts." *Id.* at 713. See also Restatement (Second) of Torts § 566 & comment b (1977). That Byrne's evaluation was more conclusory than factual does not make it other than an expression of opinion. Byrne wrote his evaluation for submission to Mararian in accordance with Academy procedure.

"The pure type of expression of opinion may also occur when the maker of the comment does not himself express the alleged facts on which he bases the expression of opinion. This happens when both parties to the communication know the facts or assume their existence and the comment is clearly based on those assumed facts and does not imply the existence of other facts in order to justify the comment." *Id.*

Although Byrne's evaluation was expressed in some tasteless and harsh language, his choice of words bespeaks an impolite bluntness rather than malice. "Malice has been stated to require evidence of 'an improper motive,' *Hartmann* v. *Boston Herald-Traveler Corp.*, 323 Mass. 56, 65 (1948), or an intent to abuse the occasion by resorting to it 'as a pretence,' *Remington* v. *Congdon*, [2 Pick. 310, 315 (1824)], or 'reckless disregard' of the rights of another, *Retailers Commercial Agency, Inc., petitioner*, 342 Mass. at 521. Cf. *Stone* v. *Essex County Newspapers, Inc.*, 367 Mass. 849 (1975). See also *Boston Mut. Life Ins. Co.* v. *Varone*, 303 F.2d 155, 159 (1st Cir. 1962)." *Ezekiel* v. *Jones Motor Co.*, 374 Mass. at 390, also citing, at n.4, to Restatement (Second) of Torts § 603 (1977), and Prosser, Torts § 115, at 795 (4th ed. 1971). The record does not support a finding that the defendants had a motive ulterior to their duty to evaluate Judd's performance in the training program.

Nor do we see malice or recklessness in McCormack's use of the words "psychological and physiological." No reasonable reader of those words in the context made would construe them as conveying diagnostic facts. When all is said and done, McCormack stated "in an oblique or hyperbolic manner," *Hoesl* v. *United States*, 451 F. Supp. 1170, 1172 (N.D. Cal. 1978), what a reasonable reader knew to mean that Judd simply did not have what it takes to be a fire fighter.

It was also Judd's position at trial that McCormack abused his privilege by writing the letter with a reckless disregard as to its truth or falsity. There is no conflict in the evidence concerning McCormack's actual knowledge of Judd's lack of ability. McCormack had no knowledge whatsoever of Judd, and he made no inquiry of Mararian, any of the instructors,

or of Judd before sending the letter. But even were the letter other than an expression of opinion, the evidence of McCormack's lack of knowledge is not sufficient to show, as Judd was required to do, that McCormack had no reason to believe the statements to be true, i.e., that he acted in reckless disregard of the truth. McCormack signed the letter on the basis of materials compiled by the faculty in a manner which entitled him to rely on its truthfulness as constituting a summary of what instructors had observed about a trainee. See *Sheehan* v. *Tobin*, 326 Mass. at 192, quoting from *Atwill* v. *Mackintosh*, 120 Mass. 177, 183 (1876); *Vigoda* v. *Barton*, 348 Mass. at 485. See also Restatement (Second) of Torts § 600 comment b (1977) ("Reckless disregard as to truth or falsity exists when there is a high degree of awareness of probable falsity or serious doubt as to the truth of the statement").

If the evidence can be construed so favorably to Judd as to show that his instructors took a strong dislike of him, Judd still did not sustain his burden of proof. The procedures by which information for the letter was compiled and the circumstances, in their totality, under which it was written and sent show neither recklessness nor animus toward Judd. See *Caverno* v. *Fellows*, 300 Mass. 331, 336-338 (1938); *Pacella* v. *Milford Radio Corp.*, 18 Mass. App. Ct. 6, 15-16 (1984). See also Restatement (Second) of Torts § 603 & comment b, at 292 (1977) ("[I]f the publication is made for the purpose of protecting the interest in question, the fact that the publication is inspired in part by resentment or indignation at the supposed misconduct of the person defamed does not constitute an abuse of the privilege").

Judd's proof shows, at best, that he did not endear himself to his instructors. That is too weak an evidentiary basis upon which to allow a conclusion that the defendants had abused the privilege given them as protection for their honesty and candor in furthering an important public interest.

IV. *Conclusion.*

Because the plaintiff failed to prove that the defendants abused their conditional privilege, the defendants' motion for a directed verdict or their motions for judgment notwithstanding

the verdict should have been allowed. The judgments are reversed, and the matter is remanded to the Superior Court for the entry of judgments for the defendants.

*So ordered.*