Patrick **CATRONE**, Plaintiff,

v.

**THOROUGHBRED RACING ASSOCIATIONS OF NORTH AMERICA, INC. and Thoroughbred Racing Protective Bureau, Inc., Defendants.**

**Civ. A. No. 86–1529–C.**

United States District Court, D. Massachusetts.

Dec. 19, 1989.

---

David Kelston, Friedman & Atherton, Boston, Mass., for plaintiff.

Michael J. Liston, Palmer & Dodge, Boston, Mass., Jack Kaplan, Carter, Ledyard & Milburn, and Elizabeth Bryson, New York City, for defendants, Thoroughbred Racing

Protective Bureau, Thoroughbred Racing Ass'n, Wickman, Berube and Graf.

Alan R. Hoffman, Lynch, Brewer, Hoffman & Sands, and Anne Hoffman, Boston, Mass., for defendants, Ogden Suffolk Downs, Inc. and New Suffolk Downs Corp.

## MEMORANDUM

CAFFREY, Senior District Judge.

This case is now before the Court on a motion for summary judgment by defendants Thoroughbred Racing Associations of North America, Inc. ("TRA") and Thoroughbred Racing Protective Bureau, Inc. ("TRPB"). The plaintiff, Patrick Catrone, filed this action on May 16, 1986 and amended his complaint on January 7, 1987. Originally, Catrone named eight defendants and asserted six claims for relief.[1] Six of the defendants and four of the claims have been dismissed by this Court on motion or by agreement of the parties.[2] The only remaining defendants are TRA and TRPB, and the only remaining claims are state common law claims for defamation and for intentional interference with advantageous business relationships. For the reasons stated below, this Court should grant summary judgment.

## I.

The relevant background for this case is extensive and detailed. In summarizing this information, we shall first discuss the TRA, the TRPB, and their practices in drafting and distributing reports in the horse racing community. Second, we shall review the facts underlying Catrone's claims for defamation and intentional interference with advantageous business relationships. Third, we shall detail the six specific statements by the TRPB which Ca-

trone alleges are defamatory and led to interference with his business relationships.

### A. The TRA, TRPB, and their Practices

The defendant TRA is a trade association of racetracks in the United States and Canada. First incorporated in 1942, the TRA is a non-profit, tax-exempt association. At present, about one-half of the racetracks in the United States and Canada belong to the TRA.

The defendant TRPB is a wholly-owned subsidiary of TRA. The TRPB provides investigative and security services for TRA member tracks. The TRPB assigns field agents to each of its member tracks who supervise the security for most TRA race tracks. These TRPB agents also investigate incidents of alleged wrongdoing and rule violations at their race tracks.

In the course of their work, the TRPB agents regularly communicate information from their investigations to the TRPB central offices. The information from these field agents is filed and may be incorporated into different TRPB reports. These TRPB reports may be recirculated to the field agents at the various member tracks. Certain TRPB reports may also be sent to management at TRA tracks or state racing commissions across the country. In this action, three types of TRPB reports are at issue—special reports, summary reports, and incident reports.

Beginning in 1949, the TRPB started publishing special reports on individuals the TRPB deemed particularly inimical to the integrity of racing. These extremely detailed reports included facts observed by TRPB agents, summaries of statements by named witnesses, and documents relevant

---

1. The original complaint also named as defendants Ogden Suffolk Downs, Inc.; Robert O'Malley as President and General Manager of Ogden Suffolk Downs; Clifford Wickman individually and as President of the TRPB; Paul Berube individually and as Vice President of the TRPB; and Kenneth Graf individually and as an officer of the TRA. The complaint as amended also included federal antitrust claims (Counts I and II) and federal civil rights claims (Counts III and IV).

2. On November 12, 1986, defendants Wickman and Graf were dismissed for lack of personal jurisdiction. On May 27, 1987, Robert O'Malley was dismissed by stipulation, and, on September 25, 1987, Paul Berube was dismissed by stipulation. On April 5, 1988, 683 F.Supp. 302, defendants' motion to dismiss the antitrust claims (Counts I and II) and motion for summary judgment on the civil rights claims (Counts III and IV) were granted by this court.

to the subject of the file. These special reports were prepared specifically for submission to state racing commissions in the event the subject of a report should make a license application. There were roughly 120 special reports prepared by the TRPB. In 1980–81, the TRPB discontinued these special reports as burdensome and repetitive of other reports.

The TRPB also compiles summary reports on individuals who were the subject of TRPB attention over a period of time. The summary reports resemble special reports in that they distill and condense facts in a complete file. But, the summary reports do not include specific notation of witnesses supporting the reports conclusions. Instead, the summary reports are a more chronological discussion of an individual's file. As such, summary reports are updated from time to time.

As noted above, the TRPB also prepares incident reports based on information from field agents. These incident reports have a specific subject and may include affidavits and documents relating to a particular event at a TRA track. These incident reports may also include background information on the subject of the report.

The TRPB policy regarding distribution of these reports includes the following limitations. First, the summary and incident reports are not to be distributed with outdated information on the subject. The reports are reviewed and redacted before distribution to non-TRPB officials to remove information more than seven years old in compliance with the Fair Credit Reporting Act ("the Act"), 15 U.S.C. § 1681.[3] Second, the summary reports and incident reports are distributed to non-TRPB officials only confidentially and on request. Both the summary reports and the incident reports include distribution lists titled with the following: "This report is furnished in strict confidence at the request of and for the exclusive use of...." Third, as noted

above, the special reports were no longer published or distributed after 1980.

### B. Catrone and the TRPB

The plaintiff, Patrick Catrone, is a race horse trainer. Catrone first received a trainer's license in 1953 from the Massachusetts Racing Commission ("MRC") and, over the last 30 years, he has trained and entered horses at race tracks in Massachusetts, New York, New Hampshire, Rhode Island, Delaware, Florida, and Maryland. Beginning in early 1970 and continuing until today, the TRPB and its agents have investigated Catrone numerous times for a variety of incidents at TRA race tracks.

In 1971, the TRPB first investigated Catrone's alleged participation in running "ringers" at several TRA tracks. A "ringer" is a superior, faster horse substituted in the place of an inferior, slower horse by falsifying the horse's identity to racing officials. After the TRPB investigation, Catrone was barred from racing in several states including Maryland and New Jersey. Catrone was also indicted by a federal grand jury in Massachusetts for illegally transporting false foal certificates in connection with the running of ringers in violation of 18 U.S.C. § 2314. Catrone was subsequently acquitted of the charge and reinstated as a trainer in Massachusetts.

In 1976, the TRPB submitted its investigative information on Catrone to the New Hampshire Racing Commission which led to the denial of Catrone's application for a license in that state. This denial, in turn, led the MRC to deny Catrone's Massachusetts trainer's license for 1977.[4] New Hampshire and Massachusetts continued to deny a trainer's license to Catrone each year until 1980 when New Hampshire ceased issuing licenses due to the destruction of the state's sole race track.

In 1981, Catrone applied for and received a trainer's license from the MRC. After receiving his license, however, Suffolk

---

3. Under 15 U.S.C. § 1681c(a)(6), no consumer reporting agency can make a report containing any "adverse item of information which antedates the report by more than seven years."

4. According to Catrone, the various state racing commissions have reciprocity agreements with one another which operate to deny a trainer licenses in all states when an individual is denied a license in one state.

Downs race track in Massachusetts excluded Catrone, in part, based on the information from TRPB which led to Catrone's license denial in New Hampshire. In 1982, Catrone was again licensed by the MRC and again was excluded from Suffolk Downs. Catrone then appealed Suffolk Down's decision to the MRC. The MRC upheld Suffolk Downs decision, and, subsequently, the Massachusetts Appeals Court affirmed the MRC decision. *Catrone v. State Racing Commission,* 17 Mass. App.Ct. 484, 459 N.E.2d 474 (1984). Catrone has since remained a licensed trainer in Massachusetts,[5] but has been barred from Suffolk Downs racetrack.

From 1985 to the present, the TRPB has continued to investigate a variety of incidents concerning Catrone at TRA race tracks. Specifically, in 1985, the TRPB investigated the running of "Fearless Beau" at the Meadowlands Race Track in New Jersey. In 1985, the TRPB investigated Catrone's association with a trainer at the rebuilt Rockingham Park Race Track in New Hampshire. In 1988, the TRPB investigated several incidents of alleged trespass at the Calder Race Track in Florida.

### C. Alleged Defamatory Statements by the TRPB

In 1986, Catrone brought suit against TRA and TRPB, among others, for defamation and intentional interference with advantageous business relationships. In the original and amended complaints, Catrone generally alleged that the TRPB had submitted "evidence" to state racing commissions in Massachusetts and New Hampshire which led to the denial of his license applications. Further, Catrone alleged that the TRPB provided information to Suffolk Downs management which led to his exclusion at that race track.

Subsequently, the parties have engaged in extensive discovery. The TRA and TRPB have produced more than 1,000 pages of old reports on Catrone, correspon-

dence relating to Catrone, and deposition testimony by TRPB officers about Catrone. From this catalogue of evidence, the parties have identified six specific publications which are the particular substance underlying Catrone's defamation claim. They are as follows:

1. Special Report # 113: This eleven-page document was prepared in 1974. As part of the special report program, this document focused on specific incidents from 1970 to 1972. The special report includes detailed accounts of alleged ringer incidents at race tracks in New Jersey, Massachusetts, and Maryland. The special report includes a basic biographical and physical description of Catrone.

The distribution of the special report is uncertain. The report does not include a distribution list, nor does either party offer evidence of its distribution to specific individuals.

2. 1978 Newsletter: This newsletter was published in 1978 to advertise the TRPB special report program. The newsletter included a one-paragraph account of the TRPB's attempts to keep Catrone from being licensed in Florida. The newsletter stated:

> Catrone is a particularly nefarious character who was at the center of a conspiracy in 1969–72 to race superior race horses under the names and identities of inferior ones. Without a doubt, Catrone is an outright detriment to racing. In the past three years, he has been denied a license in Maryland, Rhode Island, New Hampshire (by formal ruling), New York, and Pennsylvania. Florida's decision on licensing of Catrone is not presently known, however, I am thankful for the opportunity which TRPB had to oppose the licensure.

This newsletter was distributed broadly to various state racing commissions and TRA race tracks across the country.

3. 1983 Summary Report: This 36–page document is a complete summary of all information in the TRPB files as of Novem-

---

**5.** For a brief period in 1984–85, Catrone's license was suspended after he was charged with attempted larceny of an airline ride and receiv-

ing stolen airline tickets. Later in 1985, Catrone's license was restored.

722

ber 10, 1983. The 1983 Summary Report includes Catrone's juvenile and adult arrest record, lengthy accounts of Catrone's associations with various alleged bookmakers and organized crime figures between 1959 and 1970, lengthy accounts of Catrone's involvement in various alleged "ringer" schemes from 1970–72, accounts of rulings against Catrone by various state racing commissions and stewards from the mid–1970s to 1983, an account of Catrone's various legal actions in federal and state courts, and reports from agents concerning Catrone's appearance at several TRA race tracks. The information in the file is based on a variety of sources including TRPB agents and "confidential sources."

This summary report on Catrone has an attached distribution list. This list shows that summary reports on Catrone have been distributed to a variety of TRPB agents, TRA race tracks, and state racing commissions from 1967 through 1986. The only distribution to a non-TRA racetrack was in 1981 to Richard McLaughlin, a steward at the Suffolk Downs race track in Massachusetts. This distribution is corroborated by a letter to Mr. McLaughlin titled "Personal and Confidential" and dated September 16, 1981.[6]

4. 1984 "Fearless Beau" Report: This ten-page incident report was filed by a TRPB agent concerning Catrone's alleged attempt to run "Fearless Beau" at the Meadowlands Race Track in New Jersey. The report describes Catrone as an "Unlicensed and Undesirable Trainer" despite also recognizing that Catrone was "currently racing at Suffolk Downs." The report condenses past information on Catrone as follows: "TRPB files disclose considerable derogatory information for Catrone over the last twenty years, relating primarily to his association and involvement with organized crime figures, hidden ownerships, betting coups, and horse substitu-

tions (ringers)." Following this past history on Catrone, the report describes certain trainers' attempt to run the horse "Fearless Beau," which the TRPB claimed Catrone owned a one-third share, in New Jersey where Catrone was not licensed. The report also includes affidavits and documents supporting its account of the "Fearless Beau" incident.

This 1984 report includes a distribution list. This report was distributed to TRPB agents and TRA race tracks along the East Coast from 1984 to 1988. Also, the report was sent to the Massachusetts and New Jersey State Racing Commissions in 1984.

5. 1985 "Gascoigne" Report: This 12–page incident report was prepared by a TRPB field agent at Rockingham Park Race Track in New Hampshire concerning Catrone's discussions with trainer Alan Gascoigne. The report includes detailed information on Catrone including limited surveillance at and around Rockingham Park Race Track. The report also gives an account of subsequent rulings by the stewards at Rockingham who suspended Gascoigne for 60 days, later reduced on appeal to 15 days by the new Hampshire Racing Commission, for associating with Catrone. The report also included information on prior rulings by the New Hampshire Racing Commission concerning Catrone. This report was supported by various affidavits and documents.

This report also had a distribution list. The report was sent to TRPB agents, the New York office of the TRPB, a member of the New Hampshire Pari–Mutuel Committee, and members of the management at Rockingham Park in New Hampshire.

6. 1988 "Calder" Memoranda: These three internal memoranda from TRPB agents to TRPB offices recount several incidents at Calder Race Track in Florida.

6. The letter reads:
Dear Dick:
I am enclosing a report on Catrone reflecting information in our files for the past seven years. Due to the Fair Credit Reporting Act, we cannot furnish information prior to 1974.

I hope you will keep this report confidential as I do not want it to fall into the hands of Catrone.
Sincerely,
"CW"
The initials "CW" coincide with other initialed materials from Clifford Wickman, the president of the TRPB at that time.

The three memos briefly discuss Catrone's altercations with various race track officials over privileges to enter the race course stable area. One of the memos describes Catrone as an "undesirable trainer." These memos were never formally consolidated into an incident report, and they appear to have been distributed only within officials of the TRPB.

These six publications by the TRPB include the form and substance of all of Catrone's claims for defamation and for intentional interference with advantageous business relations. The parties disagree as to the veracity of some allegations found within the six documents. These factual differences need not be settled, however, as the judgment in this case rests on purely legal questions.

## II.

The defendants TRA and TRPB have moved for summary judgment in this case. A court should grant summary judgment if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). *See also Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment: the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis in the original). An issue is genuine if there is evidence sufficient for a reasonable jury to return a verdict for the opposing party. *Id.* at 248, 106 S.Ct. at 2510. The party opposing a properly supported motion cannot rest on "mere allegations," but must "set forth specific facts showing there is a genuine issue for trial." Fed.R. Civ.Pro. 56(e). *See Oliver*, 846 F.2d at 105.

In this case, the defendants raise two specific arguments which would entitle them to judgment as a matter of law. First, the defendants claim that none of the alleged defamatory statements were published within the statute of limitations period. Second, the defendants argue that all of the statements, whether or not they were defamatory, were qualifiedly privileged and the defendants did not abuse their privilege. We shall discuss each issue separately.

### A. Statute of Limitations

Under Massachusetts law, the statutes of limitations applicable to Catrone's two remaining claims are both three years. Mass.G.L. ch. 260 § 2A (intentional interference with advantageous business relationships), § 4 (defamation). The limitations periods, however, may be tolled for "inherently unknowable" wrongs until the party knew or, in the exercise of reasonable diligence, should have known of the facts underlying the claim. *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 130–31 (1st Cir.1987). *See Dinsky v. Town of Framingham*, 386 Mass. 801, 803, 438 N.E.2d 51 (1982); *Franklin v. Albert*, 381 Mass. 611, 618–19, 411 N.E.2d 458 (1980); *Friedman v. Jablonski*, 371 Mass. 482, 485–86, 358 N.E.2d 994 (1976). In this case, the initial complaint was filed on May 16, 1986 so that all actions that occurred after May 15, 1983 are clearly actionable.

The defendants initially challenged all of Catrone's alleged defamatory statements as being outside the statute of limitations. This objection, however, must reasonably be limited to those alleged defamatory statements published before May 15, 1983. Consequently, the defendants statute of limitations argument must reasonably be limited only to Special Report # 113, the 1978 Newsletter, and the 1983 Summary Report on Catrone.

■ Concerning the 1983 Summary Report, the defendants' argument is not persuasive. The 1983 Summary Report is marked as confidential. Furthermore, according to the deposition testimony of the TRPB president, these documents are generally circulated within the TRPB, to TRPB agents, and to management at TRA race tracks with specific instructions to keep

them confidential.[7] As such, these confidential statements by the TRPB appear to be inherently unknowable for a trainer like Catrone. It is not reasonable that Catrone would know the content of such confidential reports absent some notice of their existence and content. Furthermore, according to the distribution list attached to the 1983 Summary Report, copies of this report have circulated to TRPB agents and TRA management up until 1986. Consequently, the distributions of this report after May 15, 1983 are actionable as well as prior confidential distributions of the report.

█ As for Special Report # 113 and the 1978 Newsletter, the defendants' argument has merit. By Catrone's own admission, the 1978 Newsletter was broadly disseminated to TRA race tracks and state racing commissions. The newsletter specifically mentions Special Report # 113. The newsletter clearly suggests that information from Special Report # 113 was given to Florida racing officials in opposition to Catrone's application for licensing in that state. The newsletter also suggests that the TRPB appeared before other racing officials and state commissions in opposition to Catrone's licensing. Thus, in this context, it is reasonable to believe that Catrone would have notice that the TRPB, in opposing Catrone's licensings in various states, would have circulated certain derogatory information concerning Catrone. Furthermore, in publishing the newsletter broadly throughout the racing community, it is reasonable to believe Catrone, employing some diligence, would have specific notice of Special Report # 113. Consequently, Catrone cannot reasonably claim the contents of Special Report # 113 and the 1978 Newsletter were inherently unknowable.

In sum, applying the Massachusetts law, Catrone's claims for defamation regarding the 1983 Summary Report and its contents should not be barred by the statute of limitations. Catrone's claims concerning

Special Report # 113 and the 1978 Newsletter, however, ought to be barred as publications outside the three year statute of limitations period in this action.

### B. Qualified Privilege

Under Massachusetts law, it is well settled that defendants are protected by certain privileges which, as a matter of law, may provide a defense to defamation claims. See Foley v. Polaroid Corp., 400 Mass. 82, 95, 508 N.E.2d 72 (1987); Bratt v. Int'l Business Machines Corp., 392 Mass. 508, 512–16, 467 N.E.2d 126 (1984); Ezekiel v. Jones Motor Co., Inc., 374 Mass. 382, 385, 372 N.E.2d 1281 (1978). A defendant may assert a qualified privilege "where the publisher and recipient have a common interest, and the communication is of a kind reasonably calculated to further it." Sheehan v. Tobin, 326 Mass. 185, 190–191, 93 N.E.2d 524 (1950). See also Foley, 400 Mass. at 95, 508 N.E.2d 72; Bratt, 392 Mass. at 513 n. 8, 467 N.E.2d 126. Courts have consistently recognized this qualified privilege where the plaintiff and defendant have a "common business interest." Flotech, Inc. v. E.I. DuPont de Nemours & Co., 814 F.2d 775, 778 (1st Cir.1987) (qualified privilege recognized where defendant published press release concerning product which plaintiff produced); Foley, 400 Mass. at 95, 508 N.E.2d 72 (qualified privilege recognized where defendant employer falsely accused plaintiff employee of an assault on fellow employee); Bratt, 392 Mass. at 512–16, 467 N.E.2d 126 (qualified privilege recognized for employer who circulated memoranda concerning employee's mental condition); Shore v. Retailers Commercial Agency, Inc., 342 Mass. 515, 520, 174 N.E.2d 376 (1961) (qualified privilege recognized for credit agency report disclosed to client); Humphrey v. National Semiconductor Corp., 18 Mass. App.Ct. 132, 133, 463 N.E.2d 1197 (1984) (qualified privilege recognized for employee of company to make a disparaging comments about performance of employee of another company where parties had com-

---

7. This policy is corroborated by the letter from then TRPB president Charles Wickman to the state steward at Suffolk Downs stating that the

1983 Summary Report on Catrone was to be kept strictly confidential. See supra note 6.

mon business relationship). Courts have also recognized a qualified privilege where there is a subject of common public interest. *See Judd v. McCormack*, 27 Mass. App.Ct. 167, 173, 535 N.E.2d 1284 (1989) (qualified privilege recognized for instructors and officers at fire fighting academy); *Cefalu v. Globe Newspaper Co.*, 8 Mass. App.Ct. 71, 74, 391 N.E.2d 935 (1979), *cert. denied*, 444 U.S. 1060, 100 S.Ct. 994, 62 L.Ed.2d 738 (1980) (qualified privilege for newspaper to print photo of person on unemployment line). *Cf. Flotech*, 814 F.2d at 779.

This qualified privilege may also extend to protect defendants for claims of intentional interference with advantageous business relationships. *See A.F.M. Corp. v. Corporate Aircraft Management*, 626 F.Supp. 1533, 1551–52 (D.Mass.1985); *Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 663, 429 N.E.2d 21 (1981). Further, where the claim is closely related and based on the defendants defamatory actions, a qualified privilege would protect the defendant against the intentional interference claim. *Judd*, 27 Mass.App.Ct. at 174, 535 N.E.2d 1284. *See Foley*, 400 Mass. at 96, 508 N.E.2d 72. (qualified privilege for defamation also covered related loss of consortium claim).

A qualified privilege may be lost if abused by a defendant. *See Foley*, 400 Mass. at 95, 508 N.E.2d 72; *Bratt*, 392 Mass. at 509, 467 N.E.2d 126; *Shore*, 342 Mass. at 520–22, 174 N.E.2d 376; *Galvin v. N.Y., N.H., & H.R. Co.*, 341 Mass. 293, 297, 168 N.E.2d 262 (1960); *Judd*, 27 Mass. App.Ct. at 173–76, 535 N.E.2d 1284. A qualified privilege may be abused either by publishing material with "knowledge of falsity or with reckless disregard of the truth," *Tosti v. Ayik*, 386 Mass. 721, 726, 437 N.E.2d 1062 (1982), or by "unnecessary, unreasonable, or excessive publication." *Galvin*, 341 Mass. at 296, 168 N.E.2d 262. In either case, the plaintiffs must show the defendants acted recklessly, not just negligently, in publishing the alleged defamatory statements. *Foley*, 400 Mass. at 95, 508 N.E.2d 72; *Bratt*, 392 Mass. at 514, 467 N.E.2d 126. Once the defendants have met their burden of show-

ing a qualified privilege exists, then the burden shifts to the plaintiff to show the defendants abused their privilege. *Judd*, 27 Mass.App.Ct. at 173, 535 N.E.2d 1284. If defendants are entitled to a privilege and have not abused it, then the defendants are entitled to judgment as a matter of law.

■ In this case, the TRA and TRPB are entitled to a qualified privilege for communications with their own agents and with management at TRA race tracks. The TRA is an association of race tracks joined together by a common interest in preserving the integrity of thoroughbred racing. These TRA race tracks subscribe to the services of the TRPB for maintaining security and investigating allegations of wrongdoing at their tracks. The TRPB, as part of its responsibilities, sends its investigative reports to its agents or to management at TRA race tracks in order to further protect the integrity of racing. Furthermore, to the extent that Catrone attempts to conduct business at a TRA race track, he too has a common interest in the integrity of racing at that track. In sum, all the parties share a common business interest in thoroughbred racing and the publication of TRPB reports is reasonably related to that common interest. Thus, the TRA and TRPB have a qualified privilege to distribute their reports to TRPB agents in the field and to management at TRA race tracks.

The defendants TRA and TRPB are also entitled to a qualified privilege concerning their distribution of reports to various state racing commissions. The state racing commissions regulate and have authority over thoroughbred racing within their jurisdictions. *See, e.g.*, Mass.G.L. ch. 128A §§ 1– 31; N.Y. Racing, Pari–Mutuel Wagering and Breeding Law §§ 101–268 (McKinney 1984); N.H.Rev.Stat.Ann. §§ 284:1–40 (1987). The state racing commissions are authorized to maintain the integrity and fairness of racing within their jurisdictions. *See id.* The TRPB, in providing information to these state authorities is contributing to the public interest which these commissions are charged to protect. Thus, the TRPB is protected by a qualified privilege

in its communications to the various state racing commissions.

■ As noted above, once the TRA and TRPB have established their actions were protected by a qualified privilege, the burden at trial shifts to Catrone to show that the TRA and TRPB abused the privilege by recklessly publishing or distributing their reports. In reviewing this motion for summary judgment, however, the burden remains with the TRA and TRPB to show there is no genuine issue as to their abuse of privilege. Specifically, the TRA and TRPB must show there is no genuine question that their reports were published with actual malice knowing of their falsity or that they abused their privilege by "unnecessary, unreasonable, or excessive publication." *See Galvin*, 341 Mass. at 296, 168 N.E.2d 262. In reviewing the facts of this case, there is no evidence that the TRA or TRPB abused their qualified privilege in either manner.

First, on close scrutiny, the TRPB reports do not present any evidence of maliciousness or recklessness in publishing false information. The TRA and TRPB conducted their investigations and drafted their reports with particular care and concern for accuracy. For example, Special Report # 113 included detailed matter-of-fact accounts of the TRPB investigation complete with the names of witnesses willing to testify as to every allegation in the report. The summary and incident reports contained similar detailed fact-specific accounts of incidents, statements from witnesses, and rulings by various state officials, commissions, and courts. In its reports, the TRPB refrained from stating any conclusions not supported by considerable evidence. Certainly, the reports contained extensive derogatory information and a few unflattering characterizations of Catrone. Absent a showing of actual malice or knowing disregard for the truth, however, such language, in and of itself, does not show an abuse of privilege.

Catrone argues that the motives of certain TRPB officials in trying to keep Catrone from racing at TRA race tracks and from receiving a trainer's license in several states demonstrates actual malice. The TRA and TRPB, however, do not dispute any of these motivations or actions; in fact, in deposition testimony, officials of the TRPB admit they wanted to rid Catrone from racing. Such motives, however, are not evidence that the TRPB acted recklessly or maliciously in preparing its reports. Absent some evidence that these officials acted improperly based on their motives, the TRPB's motives only confirm their sincerity in doing their job.

Catrone also challenges the accuracy of certain factual details in the TRPB reports arguing that collectively the errors demonstrate recklessness. Catrone's primary support for these factual disputes is his own 46–page affidavit filed in this action. Catrone's affidavit focuses generally on his view of the incidents and investigations which are discussed in the TRPB reports. But, Catrone's affidavit, while lengthy and detailed, does not take issue with many of the facts in the TRPB reports. Regarding the incidents of running ringers in 1969–72, Catrone admitted the TRPB records "do appear to disclose that there were horse substitutions...." Concerning the 1984 Summary Report, Catrone admitted that, with some exceptions, "[t]he report does contain generally accurate information describing the numerous actions against me by the TRPB up to 1981." To the extent that Catrone's affidavit may raise some questions concerning the factual details in the TRPB reports, Catrone does no more than raise an issue of whether the TRPB was negligent as to certain specific details in their reports. All the information in the TRPB reports is supported by rulings from state racing commissions and reports from field agents. Absent some genuine question as to the recklessness of the TRPB's actions, Catrone's affidavit does not present evidence that the defendants abused their privilege.

■ Second, an examination of the TRPB's distribution of its reports presents no evidence of unnecessary or excessive publication demonstrating recklessness. In general, the TRPB only distributed materials outside the TRA and TRPB to state

racing commissions, and, as noted above, such distributions were qualifiedly privileged. Furthermore, as stated by TRPB officials in deposition testimony, the TRPB has a policy of editing and redacting old information on subjects before distributing reports outside the TRPB. Finally, all TRPB reports have clear instructions to be distributed only on request and in strict confidence..

Upon the record as presented, Catrone presents some factual evidence suggesting one exception to the TRPB's general policies. Catrone has produced a letter and an envelope clearly suggesting that, in 1981, some form of the summary report on Catrone was sent to the Suffolk Downs race track in Massachusetts, a non-TRA race track. This distribution is confirmed by a notation on the distribution list of the 1983 Summary Report produced by Catrone. In this specific instance, Catrone also alleges that the TRPB report included information more than seven years old in direct contravention of the TRPB's own policies. Catrone, however, has not produced a copy of this report, and has only produced a later, unedited or redacted copy of his summary report on file at the TRPB.

■ This incident, reviewed more closely, does not create a question as to the reckless publication of TRPB reports. The cover letter produced by Catrone is clearly addressed to Richard McLaughlin, the state steward at Suffolk Downs in 1981. Under provisions of the Massachusetts law, the state steward is appointed by and his salary set by the MRC. *See* Mass.G.L. ch. 128A § 7. All decisions by the state steward are appealable directly to the MRC and the state steward is obliged to follow the rulings of the MRC. Mass.Regs.Code title 205 § 4 (1986). In essence, the state steward is a public official and agent of the MRC at Suffolk Downs race track. Even if McLaughlin were not such a state official, as a racing official, he would share a common business interest with the TRPB in preserving the integrity of the racing at Suffolk Downs. As such, the TRPB maintains a qualified privilege to provide information to the state steward at the Suffolk Downs race track.

■ Furthermore, the letter and envelope produced by Catrone do not suggest that the TRPB behaved recklessly in providing its report to McLaughlin. The cover letter clearly states that the enclosed report only "reflect[s] information in [TRPB's] files for the past seven years" and specifically states its compliance with the Fair Credit Report Act. Furthermore, the envelope is marked "Personal and Confidential" and is addressed to a specific post office box at Suffolk Downs. Even if the report may have included some information more than seven years old, this would only raise a question of whether the TRPB was negligent in not properly editing its document. Absent some further evidence from Catrone, this distribution of the TRPB's report to Suffolk Downs cannot raise any genuine question as to the TRPB's reckless abuse of its qualified privilege.

In sum, the TRA and TRPB have met their burden of showing no genuine issue of material fact exists in this case such that a jury could reasonably find for Catrone. First, Catrone's claims based on Special Report # 113 and the 1978 Newsletter are barred by the statute of limitations. Second, the TRA and TRPB have shown that they are entitled to a qualified privilege to provide their reports to TRPB agents, TRA race tracks, and to state racing commissions and their agents. Furthermore, the TRA and TRPB have shown there is no evidence showing that they recklessly abused their qualified privilege. Consequently, the defendants' motion for summary judgment as to both the claims for defamation and intentional interference with advantageous business relationships should be granted.

Order accordingly.